IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| MICHAEL A. MCGUIRE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CASE NO. 2:11-CV-1027-WKW |
| | ) | [WO] |
| LUTHER STRANGE in his official | ) | |
| capacity, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

### I.  INTRODUCTION

Michael A. McGuire was born in Montgomery, Alabama, where he graduated from high school in 1971.  Eventually, he left the community for many years.  In 2010, at the age of 57, he and his wife returned to his hometown to be with his aging mother and other family in the area.  Unbeknownst to Mr. McGuire, his arrival coincided with the 2011 promulgation of the Alabama Sex Offender Registration and Community Notification Act ("ASORCNA"). Ala. Code § 15-20A-1 *et seq.*

Mr. McGuire has one criminal conviction, a serious one:  In 1985, he raped and otherwise assaulted his 30-year-old girlfriend of five years.  In May 1986, he was convicted of sexual assault in a Colorado state court.  Mr. McGuire spent his next three years in prison and a fourth year on parole, successfully completing his prison sentence.  He then had a multi-decade career as a hair stylist and jazz musician in the Washington, D.C. area.  Prior to

relocating to Montgomery in 2010, he had never been required to register as a sex offender. He was, in his brother's words, "a free American." (Trial Tr. I, at 14.)

After resettling in his hometown and on the advice of his brother, a local attorney, Mr. McGuire voluntarily visited the Montgomery Police Department to inquire about the scope of Alabama's sex-offender laws, hoping to confirm his belief that he would not be subject to the state's restrictions. That belief was erroneous by multiples. Mr. McGuire now lives homeless and unemployed under a bridge in his hometown. Pursuant to ASORCNA, he is required to register as a homeless sex offender in-person at both the City of Montgomery Police Department and the Montgomery County Sheriff's Department every week. In fact, for the rest of his life, he is subject to the most comprehensive, debilitating sex-offender scheme in the land, one that includes not only most of the restrictive features used by various other jurisdictions, but also unique additional requirements and restrictions nonexistent elsewhere, at least in this form. He challenges ASORCNA as violating the Ex Post Facto Clause of the United States Constitution.

The court held a four-day bench trial and received post-trial briefing on the constitutional issue. This opinion constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

## II. JURISDICTION AND VENUE

Subject-matter jurisdiction is exercised pursuant to 28 U.S.C. §§ 1331, 1343, and 2201. The parties do not contest personal jurisdiction or venue.

### III.  PROCEDURAL HISTORY

Mr. McGuire filed his complaint challenging ASORCNA on December 2, 2011.  Over the course of litigation, Mr. McGuire amended his complaint four times.  In its final iteration, Mr. McGuire's Third Amended Complaint brought claims under federal law (Counts I–VII) and state law (Counts VIII–IX).  It alleged liability under 42 U.S.C. § 1983 for an assortment of federal constitutional violations, including deprivations of due process and liberty, violations of equal protection, the application of ex post facto laws, and illegal seizure, and under state law for claims that included, among others, false imprisonment, false arrest, and negligence.[1]

Motions to dismiss the Third Amended Complaint were filed by all Defendants as to each of Mr. McGuire's claims.  After a thorough period of briefing, the court reviewed each of Mr. McGuire's twelve causes of action as to each of the six remaining Defendants.  On

---

[1] Mr. McGuire's Third Amended Complaint sought a declaratory judgment, injunctive relief, and compensatory and punitive damages.  On September 9, 2013, however, an Order was issued clarifying the forms of relief available to Mr. McGuire should he prevail.  Pursuant to the September 9, 2013 Order, all the individual Defendants had qualified immunity from Mr. McGuire's claims for monetary damages brought against them in their individual capacities.  Additionally, the State Officials – the Montgomery County Sheriff, the Alabama Director of Public Safety, and the Alabama Attorney General – had Eleventh Amendment immunity from monetary claims against them in their official capacities, as well as from a declaratory judgment against them in their official capacities with respect to the alleged illegality of their past conduct.  The Order, however, found that the Eleventh Amendment did not bar the official-capacity claims against the State Officers for prospective injunctive relief.  Consequently, the Order left intact the following relief against the non-State Officers:  monetary and equitable relief against the City of Montgomery; prospective injunctive and declaratory relief against the individual Defendants in their official capacities; and monetary damages against the individual city Defendants in their official capacities.  On March 12, 2014, Mr. McGuire's contentions in the Order on the Pretrial Hearing further narrowed the relief sought to prospective injunctive and declaratory relief exclusively.

March 29, 2013, a Memorandum Opinion and Order was issued, granting in part and denying in part Defendants' motions to dismiss, ultimately leaving only Mr. McGuire's ex post facto challenge to proceed.   The six remaining Defendants are the City of Montgomery, Montgomery Police Chief Ernest Finley in his official capacity, Montgomery Mayor Todd Strange in his official capacity, Montgomery County Sheriff Derrick Cunningham in his official capacity, Acting Director of the Alabama Department of Public Safety John Richardson in his official capacity, and Alabama Attorney General Luther Strange in his official capacity.[2]

On March 31, 2014, through April 3, 2014, a four-day bench trial was held on Mr. McGuire's ex post facto challenge to ASORCNA.   At the close of trial, all parties were ordered to submit additional briefing on certain topics.   After considering the briefs filed in connection with pretrial motions, the post-trial briefs, and the arguments and evidence presented at trial, the court finds that judgment is due to be entered in favor of Mr. McGuire on his challenge to ASORCNA's provisions requiring dual weekly registration for in-town homeless registrants and dual travel permit applications for all in-town registrants, and in favor of Defendants on the remaining ex post facto claims.

---

[2] In an apparent response to Defendants' motions to dismiss earlier iterations of his complaint, Mr. McGuire voluntarily dismissed his claims against the other Defendants, namely, the City of Montgomery Police Department and four affiliated detectives, the Montgomery County Sheriff's Department and one of its deputies, an Attorney with the Alabama Department of Public Safety, United States Attorney General Eric Holder, and the Alabama Department of Public Safety.  (Docs. # 48, 88.)

## IV.  FINDINGS OF FACT

### A.  ASORCNA

On July 1, 2011, ASORCNA became effective and repealed all prior iterations of Alabama's sex offender registration and notification laws.   2011 Ala. Acts, No. 640. ASORCNA's provisions apply to adult offenders convicted of one of thirty-one offenses defined as a sex offense under Alabama law, as well as those convicted in another jurisdiction of a crime that, "if it had been committed in [Alabama] under the current provisions of law, would constitute" one of the enumerated offenses.  Ala. Code § 15-20A-5(33).  The entire scheme is retroactive, capturing any enumerated or similar offense regardless of when it was committed.

ASORCNA restricts where a registrant may live and work,[3] *id.* §§ 15-20A-11, -13, requires the distribution of community-notification flyers to those living near a registrant's

---

[3]  ASORCNA prohibits registrants from "maintaining" a residence within 2,000 feet of property containing "any school or childcare facility" and from living within 2,000 feet of the registrant's former victim or the victim's immediate family.  *Id.* §§ 15-20A-11(a), (b).  With no reference to the nature of the offense of conviction, it also prohibits registrants from sharing a residence with a minor, unless the registrant is "the parent, grandparent, stepparent, sibling, or stepsibling of the minor."  *Id.* § 15-20A-11(d).  If, however, any of the registrant's victims were the registrant's "minor children, grandchildren, stepchildren, siblings, or stepsiblings," or any other child, the exemption for living with immediate family members does not apply.  *Id.*

ASORCNA also prohibits registrants from working or volunteering "at any school, childcare facility, or mobile vending business that provides services primarily to children, or any other business or organization that provides services primarily to children."  *Id.* § 15-20A-13(a). Additionally, no registrant may "apply for, accept or maintain employment or volunteer for any employment or vocation" "within 2,000 feet of the property on which a school or childcare facility is located" or "within 500 feet of a playground, park, athletic field or facility, or any other business having a principal purpose of caring for, educating, or entertaining minors."  *Id.* § 15-20A-13(c). The employment provisions – like most of the residency restrictions outlined above – apply with equal force regardless of whether the registrant's former victim was a minor.

residence, *id.* § 15-20A-21, and provides for a "public registry website maintained by the Department of Public Safety." *Id.* § 15-20A-8. The website is required to include specific information regarding each registrant. Registrants must "appear in person to verify all required registration information" quarterly. *Id.* § 15-20A-10(f). The law also requires each registrant to "obtain, and always have in his or her possession, . . . a driver's license or identification card bearing a designation that enables law enforcement officers to identify the licensee as a sex offender." *Id.* §§ 15-20A-18(a), (d).

Additionally, ASORCNA requires registrants who intend to be away from their county of residence for three or more consecutive days to "report such information in person immediately prior to leaving" and to complete a travel permit form providing "the dates of travel and temporary lodging information." *Id.* §§ 15-20A-15(a), (b). The permit form explains the duties of the registrant regarding travel, and registrants must sign the form, acknowledging their duties, or "the travel permit shall be denied." *Id.* § 15-20A-15(d). When a registrant obtains a permit, the registrant's local sheriff must "immediately notify local law enforcement" in the registrant's destination. *Id.* § 15-20A-15(e). Importantly, registrants who reside in municipalities ("in-town registrants") must obtain travel permits from both the local police and county sheriff. The forms for obtaining travel permits, which were developed by the Alabama Department of Public Safety, are virtually identical for the local police and the sheriff.

ASORCNA's provisions apply for life and without regard to the nature of the offense, the age of the victim, or the passage of time since the underlying sex offense. *Id.* § 15-20A-3. ASORCNA does contain three general relief provisions, none of which is applicable to

6

Mr. McGuire.[4]  A violation of ASORCNA's requirements potentially subjects the offender to one of 115 Class C felonies, 82 of which are applicable to Mr. McGuire.[5]  *See, e.g.*, *id.* § 15-20A-15(h).  Class C felonies in Alabama carry a sentence from one to ten years.  *Id.* § 13A-5-6.[6]

ASORCNA's registration scheme requires offenders to register in-person four times a year, both with "[t]he sheriff of the county and the chief of police if the location subject to registration is within the corporate limits of any municipality."  *Id.* §§ 15-20A-4, -10.  For homeless offenders who reside within the city limits of any municipality, the registration requirement is enhanced to once a week with both law enforcement jurisdictions ("dual registration").  *Id.* §§ 15-20A-4(13), -12(b).  Thus, in-town homeless offenders must register in-person a minimum of 112 times a year.  The county and city forms to be completed by

---

[4] First, certain offenders are eligible for relief from the residency restrictions if they can convince a state circuit court that they are terminally ill or permanently immobile.  *Id.* § 15-20A-23.  Second, certain offenders convicted of relatively minor offenses can obtain circuit court relief from ASORCNA's registration and notification requirements.  *Id.* § 15-20A-24.  Finally, a similar provision allows for circuit court relief from ASORCNA's employment restrictions for a set of less serious crimes.  *Id.* § 15-20A-25.

[5] Mr. McGuire has consistently argued that the Class C felonies imposed by ASORCNA are strict liability offenses.  However, Mr. McGuire is incorrect in this regard; under Alabama law, "[a] statute defining a crime, unless clearly indicating a legislative intent to impose strict liability, states a crime of mental culpability."  *Id.* § 13A-2-4(b).  Because the felony provisions of ASORCNA do not explicitly state that the Class C felonies are strict liability offenses, some level of mental culpability is required for conviction.  *See Sullens v. State*, 878 So. 2d 1216, 1221 (Ala. Crim. App. 2003) (finding that a criminal provision did not define a strict liability offense because the provision did "not expressly state that [the conduct was] a strict liability offense"); Ala. Code § 13A-2-4 cmt. ("Subsection (b) explicitly states a policy adverse to arbitrary use of 'strict liability' concepts. An express statement is required in the statute defining the offense if strict liability is being imposed.").

[6] Defendants attempt to minimize the felony consequences:  "Offenders who fail to comply with these requirements are subject to a *low-level felony conviction*," Doc. # 255 at 15 (emphasis added), which the court likens to being shot with a smaller-caliber bullet.

homeless registrants are substantively identical.  Montgomery currently has three homeless offenders out of roughly 500 registrants.

Finally, the Legislature delegated rule-promulgating authority for ASORCNA to the Director of the Alabama Department of Public Safety.  *Id.* § 15-20A-44.  This accounts for the strong similarity in the ASORCNA forms used by local police departments and county sheriffs.

The Alabama Legislature made the following findings relevant to its intent in enacting the scheme:

> (1)    Registration and notification laws are a vital concern as the number of sex offenders continues to rise.  The increasing numbers coupled with the danger of recidivism place society at risk.  Registration and notification laws strive to reduce these dangers by increasing public safety and mandating the release of certain information to the public.  This release of information creates better awareness and informs the public of the presence of sex offenders in the community, thereby enabling the public to take action to protect themselves.  Registration and notification laws aid in public awareness and not only protect the community, but serve to deter sex offenders from future crimes through frequent in-person registration.  Frequent in-person registration maintains constant contact between sex offenders and law enforcement, providing law enforcement with priceless tools to aid them in their investigations including obtaining information for identifying, monitoring, and tracking sex offenders.

> (3)    Homeless sex offenders are a group of sex offenders who need to be monitored more frequently for the protection of the public.  Homeless sex offenders present a growing concern for law enforcement due to their mobility.  As the number of homeless sex offenders increases, locating, tracking, and monitoring these offenders becomes more difficult.

> (5)    Sex offenders, due to the nature of their offenses, have a reduced expectation of privacy.  In balancing the sex offender's rights, and the interest of public safety, the Legislature finds that releasing certain information to the public furthers the primary governmental interest of protecting vulnerable populations, particularly children.  Employment and residence restrictions, together with monitoring and tracking, also further that interest.  The Legislature declares that its intent in imposing certain registration, notification,

8

> monitoring, and tracking requirements on sex offenders is not to punish sex
> offenders but to protect the public, and most importantly, promote child safety.

*Id.* §§ 15-20A-2(1), (3), (5).  With regard to the branding of one's sex-offender status on the

ASORCNA-required driver's license or official identification card, the Legislature intended

"a designation that enables law enforcement officers to identify the licensee as a sex offender"

but did not specify the method of notice on the license.  *Id.* § 15-20A-18.

**B.**     **Mr. McGuire's Experience**

Mr. McGuire turned 60 years old during the course of this trial.  He is a sex offender

under ASORCNA, and, as a result, he is required to register with the City of Montgomery

Police Department and the Montgomery County Sheriff's Department on a regular basis.  Mr.

McGuire is one of more than 500 registered sex offenders residing in Montgomery County,

over 430 of whom live within the Montgomery city limits.

Mr. McGuire's registry information has been available to the public via the Alabama

and federal sex-offender registries since May of 2010.    Additionally, pursuant to

ASORCNA's community-notification provision, persons within the statute's prescribed

proximity to Mr. McGuire's registered residence were notified by flyer in June of 2010 that

Mr. McGuire is a registered sex offender.    During each quarterly registration at the

Montgomery Police Department and the Montgomery County Sheriff's Office, Mr. McGuire

is supposed to pay a $10 fee.  Due to his "homeless status," however, Mr. McGuire's fee has

been waived.  (Doc. # 251, at 40:12–14.)

Mr. McGuire is currently one of three homeless offenders in Montgomery County, and

he lists his residence as being under a bridge in the City of Montgomery.  Mr. McGuire's wife

of eleven years is not homeless; she lives in the house that the couple rents from Mr. McGuire's brother.  Because the house is not in an ASORCNA-compliant area, Mr. McGuire is prohibited from residing in the house with his wife.  He may, however, stay in the house not more than two consecutive nights, not to exceed nine nights a month.  *Id*. § 15-20A-11(e).

Mr. McGuire asked local law enforcement about the suitability of fifty to sixty other homes in the City, but none complied.  It is undisputed that Mr. McGuire and his wife lived in the Regency Inn from April 27, 2010, until July 19, 2010, paying a weekly rent.  Eventually, however, he depleted his savings, and the couple moved out.  The testimony of Mr. McGuire's expert established that, conservatively, 80 percent of the city's housing stock was not ASORCNA-compliant, thereby creating a large, residential "zone of exclusion."  The City of Montgomery has over 96,000 parcels of real estate.  (Trial Tr. I, at 61.)  The precise extent of the zone of exclusion is an ever-moving target, changing almost daily with the ebb and flow of real estate transactions.  It is undisputed, however, that much of the City's housing is not available for sale or rent at any one time, and Mr. McGuire's expert testified that some of the available housing stock is in expensive neighborhoods and some is in undeveloped rural areas.  The expert testified that 76.8 percent of the parcels "are off limits to people subject to ASORCNA" and that "80 percent of where the people are actually living in the city is off limits to people subject to the statute."  (Trial Tr. I, at 46.)  Accurately accounting for housing availability for sex offenders is, in short, an unresolvable nightmare for law enforcement.  For registrants, who bear the burden of locating such housing under the penalty of several felony offenses should they make the wrong decision, keeping track is impossible, period.  Nevertheless, all but three of the more than 430 sex offenders registered in the City of

Montgomery have found compliant homes, are grandfathered into non-compliant areas, or no longer reside in the City.

Because Mr. McGuire is homeless, he registers quarterly and weekly with both the Montgomery County Sheriff's Office and the Montgomery City Police Department. The two offices are located five miles apart. On occasion, Mr. McGuire has had to walk as far as twenty miles to register with both jurisdictions.

Before moving to Alabama in 2010, Mr. McGuire was employed as a hair stylist and musician. Since moving to Alabama, ASORCNA has prevented Mr. McGuire from accepting or applying for a number of jobs, including music-related engagements.[7] He is occasionally able to arrange to play in a compliant zone, for which he is paid $125 per event. As a result of the employment restrictions, Mr. McGuire lives mostly on a fixed income comprised of disability benefits.

Mr. McGuire is subject to other ASORCNA requirements as well. For example, he has had to replace his driver's license with a new ASORCNA-compliant license. On the front of his new license is the inscription "CRIMINAL SEX OFFENDER" in red lettering. Mr. McGuire has also had to limit his travel – a hobby he enjoyed prior to moving to Alabama – because of the three-day travel permit requirement. Applying for the permit requires registration at two jurisdictions for all in-town offenders, homeless or not.

---

[7] Indeed, under ASORCNA, approximately 85 percent of jobs in the city are barred to offenders (creating an employment "zone of exclusion"). Approximately 50 percent of the 500 offenders in Montgomery County are unemployed. Admittedly, a certain unspecified portion of that percentage is not actively seeking employment.

## V. CONCLUSIONS OF LAW

### A.   <u>Proper Defendants</u>

In challenging ASORCNA, Mr. McGuire brought this lawsuit against a number of individuals and governmental entities.  The viability of his claims against each Defendant will be addressed in turn.

### 1.   *City of Montgomery, the Mayor, and the Chief of Police*

Mr. McGuire's § 1983 ex post facto claims for injunctive and declaratory relief remain pending against the City of Montgomery, the Mayor in his official capacity, and the Chief of Police in his official capacity.  For the reasons that follow, the claims against the City, the Mayor, and the Chief of Police are due to be dismissed.

### a.   **Official-Capacity Suit Against the Mayor and the Chief of Police**

For purposes of § 1983, suits against the Mayor and the Chief of Police in their official capacities are suits against the City itself.  *See McMillian v. Monroe Cnty., Ala.*, 520 U.S. 781, 785 n.2 (1997); *see also Cooper v. Dillon*, 403 F.3d 1208, 1215 (11th Cir. 2005) (noting that a § 1983 suit against a municipal police chief is "the same as a suit against the municipality").  Because the City is also a defendant, the § 1983 ex post facto claims against the Mayor and Chief of Police in their official capacities are due to be dismissed as redundant.[8]  *See Gray v.*

---

[8] Mr. McGuire does not appear to allege a claim against the former Mayor and Chief of Police in their individual capacities for injunctive and declaratory relief.  (Doc. # 256, at 10 ("All of the Defendants in the matter – who are properly sued in their official capacities because they enforce ASORCNA – should be enjoined from enforcing the statute.").)  But, even if the operative complaint could be construed to allege such a claim, Mr. McGuire cites no controlling or otherwise supportive authority for such a claim.  At least one district court in this circuit has found that individual-capacity suits under § 1983 for equitable relief are not sustainable.  *Jones v. Buckner*, 963 (continued . . . )

*City of Eufaula*, 31 F. Supp. 2d 957, 965 (M.D. Ala. 1998) (dismissing as redundant a § 1983 official-capacity claim where the plaintiff also brought a § 1983 claim against the city).

### b.      City of Montgomery

For a city to be liable under § 1983, "the plaintiff has the burden to show that a deprivation of constitutional rights occurred as a result of an official government policy or custom." *Cooper v. Dillon*, 403 F.3d 1208, 1221 (11th Cir. 2005) (defining "custom" and "policy").  "'Only those officials who have final policymaking authority may render the municipality liable under § 1983.'" *Id.* (quoting *Hill v. Clifton*, 74 F.3d 1150, 1152 (11th Cir. 1996)).

In *Cooper*, the Eleventh Circuit addressed whether a city could be held liable under § 1983 for a police chief's enforcement of an unconstitutional state statute. *Id.* at 1222.  In that case, the police chief had ordered the arrest of the plaintiff, who was a newspaper publisher, for publishing news articles "disclosing . . . information he obtained as a participant in an internal investigation."  *Id.* at 1213.  The court determined that the state statute under which the publisher was arrested was "an unconstitutional abridgment of core First Amendment rights," *id.* at 1219, and that "state law demonstrate[d] that [the police chief] was

_____

( . . . continued) F. Supp. 2d 1267, 1281 (N.D. Ala. 2013) (citing *Brown v. Montoya*, 662 F.3d 1152, 1161 n.5 (10th Cir. 2011) ("Section 1983 plaintiffs may sue individual-capacity defendants only for money damages and official-capacity defendants only for injunctive relief."); *Greenawalt v. Ind. Dep't of Corrs.*, 397 F.3d 587, 589 (7th Cir. 2005) ("[S]ection 1983 does not permit injunctive relief against state officials sued in their individual as distinct from their official capacity.")); *see also Wolfe v. Straijman*, 392 F.3d 358, 360 n.2 (9th Cir. 2004) (noting that injunctive and equitable relief were not available in § 1983 individual capacity suits).  The court envisions no reason, and none has been offered, for departing from the foregoing principles to the extent that Mr. McGuire has brought § 1983 individual-capacity claims for injunctive and declaratory relief against the former Mayor and Chief of Police.

the ultimate policymaker for police procedure" for the city." *Id.* at 1222.  Rejecting the police chief's argument that the city could not "be liable for enforcing an unconstitutional *state* statute," the Eleventh Circuit held that the city had "adopt[ed] the unconstitutional proscriptions [of the statute] as its own" by enacting an ordinance that made it unlawful to commit a state-defined offense within the city limits.  *Id.*  Hence, the Eleventh Circuit held that the city, "through the actions of [its police chief], adopted a policy that caused the deprivation of [the plaintiff's] constitutional rights which rendered the municipality liable under § 1983." *Id.* at 1223.

Unlike in *Cooper*, Mr. McGuire presents no evidence indicating that a City of Montgomery official has final policy-making authority over the provisions of ASORCNA. Rather, the Alabama Legislature delegated the interstitial policy-making function of ASORCNA to the Director of the Department of Public Safety.  Additionally, no evidence has been offered indicating that any City official has discretionary authority over the promulgation of rules associated with ASORCNA, or that any such rules have been promulgated by the City.  Because there is no evidence that the City has "consciously chosen [the methods in which ASORCNA has been implemented] from among various alternatives," *City of Oklahoma v. Tuttle*, 471 U.S. 808, 823 (1985), there has been no showing that any of the alleged actions in this case were a result of a *city* custom or policy.  Accordingly, the City of Montgomery is due to be dismissed.

### 2.  *State Officials*

Mr. McGuire also seeks prospective injunctive and declaratory relief against the State Attorney General, the Montgomery County Sheriff, and the Alabama Department of Public

Safety Director in their official capacities ("State Officials").  As explained in the September 9, 2013 Order (Doc. # 134), these are viable avenues of relief under § 1983.  *See generally Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1336 (11th Cir. 1999) (The Eleventh Amendment, by application of the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), does not bar § 1983 official-capacity suits for "*prospective* equitable relief to end *continuing* violations of federal law.").  Accordingly, Mr. McGuire's lawsuit proceeds only as to his § 1983 claims seeking to enjoin the State Officials[9] in their official capacities from continuing to enforce an allegedly ex post facto law and for corresponding declaratory relief.

**B.   Standing**

Mr. McGuire challenges ASORCNA's registration, notification, driver's license inscription, and registration-fee requirements, as well as its residency, employment, and travel restrictions.  Of those challenges, the State[10] argues that Mr. McGuire lacks standing to challenge the employment and travel restrictions and the registration-fee requirements.[11]

The State argues that, because Mr. McGuire does not have definite plans to travel and has not tried to travel in the recent past, he has suffered no injury with regard to ASORCNA's travel-permit requirement.  Similarly, the State argues that, because Mr. McGuire admitted at

---

[9] In Alabama, county sheriffs are state officials.  *See McMillian v. Monroe Cnty., Ala.*, 520 U.S. 781, 793 (1997) ("Alabama sheriffs, when executing their law enforcement duties, represent the State of Alabama, not their counties.").

[10] Arguments of the State are derived from the arguments and brief of the Attorney General. The other Defendants adopted the Attorney General's standing and ex post facto arguments in their entirety.

[11] The State challenges Mr. McGuire's standing to attack several other components of ASORCNA, such as the juvenile-offender and sexually-violent-predator provisions. Mr. McGuire does not challenge those provisions, however, so he is not asserting standing as to those provisions.

the hearing that he was not currently seeking employment, he does not have standing to challenge the employment restrictions.  Finally, the State contends that Mr. McGuire cannot challenge the registration-fee requirement because his fee has often been waived in light of his "homeless" status.  All three of the State's arguments are unpersuasive.

The right to travel is a fundamental right.  *United States v. Guest*, 383 U.S. 745, 758 (1966) ("[F]reedom to travel throughout the United States has long been recognized as a basic right under the Constitution.").  Further, a plaintiff need not "first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters his exercise of constitutional rights."  *Steffel v. Thompson*, 415 U.S. 452, 459 (1974).  Because Mr. McGuire's right to travel is deterred by ASORCNA's travel-permit requirement and corresponding risk of felony convictions, Mr. McGuire has standing to challenge the requirement.

As to employment, while it is true that Mr. McGuire is not currently looking for work, he stated that work in the form of musical engagements often "come[s] to [him]." (Doc. # 251, at 39:13.)  There is no question that Mr. McGuire's musical employment has been and will continue to be negatively impacted by ASORCNA.  In particular, Mr. McGuire proved that he continues to turn down musical performances because the performances are scheduled in venues located in non-compliant areas.  (Doc. # 251, at 25:13–25.)  The fact that Mr. McGuire has had to decline offers to work at venues in non-compliant areas confers standing for purposes of challenging ASORCNA's employment restrictions.

Finally, as to the registration-fee requirement, "[a]n allegation of future injury may suffice [for a plaintiff to have standing] if the threatened injury is certainly impending, or

there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (internal quotations omitted).  While Mr. McGuire is not paying the fee currently, he is exempt only because he is homeless.  (Doc. # 251, at 40:12–14.) Regardless of whether this is a decision made by law enforcement or an adjudication of indigence by a judge, the risk that Mr. McGuire may lose his homeless or indigent status and thus be required to pay the fee is substantial enough to confer standing to challenge the registration-fee requirement.  *See, e.g.*, *Blum v. Yaretsky*, 457 U.S. 991, 1000–01 (1982) (finding standing because respondents nursing home remained "free to determine independently that respondents' continued stay at current levels of care [was] not medically necessary," and based on analogous past decisions, the threat of such a decision was "quite realistic").

Accordingly, Mr. McGuire has standing to challenge ASORCNA's registration, notification, driver's license inscription, and registration-fee requirements, as well as its residency, employment, and travel restrictions.

## C.   **Ex Post Facto Challenge**

Mr. McGuire's sole remaining claim is that ASORCNA violates the Ex Post Facto Clause of the United States Constitution.  The Ex Post Facto Clause "forbids the Congress and the States to enact any law 'which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed.'" *Weaver v. Graham*, 450 U.S. 24, 28 (1981) (quoting *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325 (1866)).  As the Supreme Court has explained, the Ex Post Facto Clause is but one expression of the "deeply rooted" jurisprudential "presumption against the

retroactive application of new laws." *Lynce v. Mathis*, 519, U.S. 433, 439–40 (1997). This "limit[ation] on the sovereign's ability to use its lawmaking power to modify bargains it has made with its subjects" protects "not only the rich and the powerful, but also the indigent defendant engaged in negotiations that may lead to an acknowledgement of guilt and a suitable punishment." *Id*. at 440 (internal citation omitted). The protection afforded by the Ex Post Facto Clause is limited, however, as the Supreme Court has held that its prohibition "applies only to criminal laws, not to civil regulatory regimes." *United States v. W.B.H.*, 664 F.3d 848, 852 (11th Cir. 2011) (citing *Kansas v. Hendricks*, 521 U.S. 346, 369 (1997)).

Because a civil regulatory regime is not subject to an ex post facto challenge, the issue is whether ASORCNA may fairly be characterized as criminal, imposing a retroactive punishment, or is more properly categorized as civil and nonpunitive. *Id*. The framework for this inquiry is well settled. *Smith v. Doe*, 538 U.S. 84, 92 (2003) (outlining the Court's two-step approach). First, a court must look to legislative intent. If it determines that "the intention of the legislature was to impose punishment, that ends the inquiry," and a plaintiff may proceed with the ex post facto challenge. *Id*. If, however, the legislature intended "to enact a regulatory scheme that is civil and nonpunitive," the court must proceed to step two and determine "whether the statutory scheme is 'so punitive either in purpose or effect as to negate'" the Legislature's civil intent. *Id*. (quoting *United States v. Ward*, 448 U.S. 242, 248–49 (1980) (internal quotations and alterations omitted)).

### 1.    *Step One: The Expressed Intent of the Alabama Legislature*

To determine the intent of the Alabama Legislature in enacting ASORCNA, the court is to consider the statute's text and structure, as well as the "[o]ther formal attributes of a

legislative enactment, such as the manner of its codification or the enforcement procedures it establishes."[12]  *Smith*, 538 U.S. at 92–94.  Because "[a] conclusion that the legislature intended to punish would satisfy an ex post facto challenge without further inquiry into its effects, . . . considerable deference must be accorded to the intent as the legislature stated it." *Id.* at 92–93.  Here, the majority of considerations indicate that the Alabama Legislature's express intent was to enact a civil regulatory scheme, not to impose punishment.

First, just as the Supreme Court observed in *Smith v. Doe* – a leading case in which the Court analyzed whether Alaska's sex-offender legislation was criminal or civil – the Alabama Legislature "expressed the objective of the law in the statutory text itself."  538 U.S. at 93 (recognizing that the Alaska Legislature expressed a clear civil intent when it spoke to sex offenders' high recidivism rates and identified public safety as the government's primary motivator).  In ASORCNA's legislative findings section, the Legislature "declares that its intent in imposing certain registration, notification, monitoring, and tracking requirements on sex offenders is not to punish registrants but to protect the public and, most importantly, promote child safety."  Ala. Code § 15-20A-2(5).  And specifically with regard to homeless

_____

[12] Mr. McGuire argues that the court should also look beyond the Legislature's stated intent to what is implied by the statute's text.  For support, Mr. McGuire points to *Doe v. Nebraska*, in which a Nebraska District Court found the state legislature's intent in enacting sex-offender legislation to be punitive in light of a state senator's anti-offender commentary, the distinctions between the state legislation and its federal counterpart, the legislation's impact, and "the blatant willingness of the Nebraska Legislature to violate [various other provisions of] the Constitution."  898 F. Supp. 2d 1126, 1125–27 (D. Neb. 2012).  Unlike *Doe v. Nebraska*, however, Mr. McGuire does not have the "benefit" of a senator's disparaging commentary, and any further comparison between this case and *Doe v. Nebraska* is better suited to the second-step of the analysis, where an examination of effects properly lies.

sex offenders, the statute notes that their increased "mobility" necessitates more frequent monitoring "for the protection of the public." *Id.* § 15-20A-2(3). Because the Alabama Legislature expressly disavowed a penal motivation and, instead, highlighted its concern for public safety,[13] there is no doubt that the Alabama Legislature proffered a civil purpose and indicated its preference for a civil label. *See Smith*, 538 U.S. at 93 ("[C]ourts 'must first ask whether the legislature, in establishing the penalizing mechanism, indicated whether expressly or impliedly a preference for one label or the other.'" (quoting *Hudson v. United States,* 522 U.S. 93, 99 (1997))).

Mr. McGuire argues that, based solely on the text of the statute, the Legislature's intent is, at most, ambiguous. As an example of one of ASORCNA's more criminal-like features, Mr. McGuire points out that it is codified in Alabama's criminal procedure code. Additionally, ASORCNA incorporates criminal penalties for enforcement purposes, which could indicate that the statute was intended as a criminal measure. The Court in *Smith*, however, faced similar statutory attributes it considered "open for debate" and still found that Alaska Legislature's purpose in enacting the statute was nonpunitive. *Id.* at 94.

In *Smith*, the Court discussed how the notification provisions of Alaska's sex-offender statute were codified in the state's "Health, Safety, and Housing Code" while the registration provisions were codified in Alaska's criminal procedure code. 538 U.S. at 95. It

---

[13] Mr. McGuire argues that the legislative findings also indicate a punitive intent in light of the legislature's inclusion of the word *certain* in § 15-20A-2(5). Specifically, Mr. McGuire contends that because the Legislature only stated that its intent was nonpunitive when it "impos[ed] *certain* registration, notification, monitoring and tracking requirements on sex offenders," the employment and travel restrictions must be taken as punitive. (quoting Ala. Code § 15-20A-2(5)). While the court takes note of Mr. McGuire's linguistic argument, it is unable to find that the Legislature's use of the word *certain* negates its clear renunciation of a punitive intent.

went on to note, however, that "[t]he location and labels of a statutory provision" are not dispositive factors and recognized that Alaska's Code of Criminal Procedure "contain[ed] many provisions that d[id]  not involve criminal punishment, such as the civil procedures for disposing of recovered and seized property." *Id*.  Additionally, the fact that Alaska "invoke[d] the criminal process in aid of" its regulatory scheme by providing notice of the act to defendants during their plea colloquies and incorporating criminal penalties, did "not render the statutory scheme itself punitive."  *Id*. at 96.  Rather, the Court "infer[red] that the legislature envisioned the Act's implementation to be civil and administrative" as it vested the authority to promulgate regulations in an administrative agency and did not include "any of the safeguards associated with the criminal process."  *Id*.

Here, while all of ASORCNA is codified within the criminal procedure code, Alabama's criminal procedure code contains many provisions similar to the nonpunitive provisions highlighted in *Smith*. Specifically, Alabama's criminal procedure code contains provisions for "disposing of recovered and seized property [Ala. Code § 15-5-50–65] . . . and laws governing actions for writs of habeas corpus [*Id.* § 15-21-1–34], which under [Alabama] law are 'independent civil proceeding[s].'" *Id.*; *see also Woods v. State*, 87 So. 2d 633, 636 (Ala. 1956) ("It seems to be the general opinion that habeas corpus is a civil, as distinguished from a criminal, remedy or proceeding, regardless of whether the prisoner is detained under civil or criminal process.").  Further, other provisions within the criminal procedure code do not involve criminal punishment, such as procedures for using audio-video communications during criminal pre-trial proceedings, Ala. Code § 15-26-1–6; laws protecting child victims and witnesses in prosecutions for sexual offenses and exploitations involving children, *id.* §§

21

15-25-1–6, -30–40; and laws governing the rights of crime victims generally, *id.* §§ 15-23-1– 23, -40–46, -60–84, -100–04. Thus, as in *Smith*, the codification of ASORCNA within the criminal procedure code "is not sufficient to support a conclusion that the legislative intent was punitive." 538 U.S. at 95.

Additionally, ASORCNA's enforcement provisions do not support a conclusion that the Legislature's intent was punitive. No procedural safeguards associated with criminal law are included alongside ASORCNA's restrictions or requirements. Further, ASORCNA does not mandate any procedures, but rather vests the Alabama Department of Public Safety with the "authority to promulgate any rules as are necessary to implement and enforce" the Act. Ala. Code § 15-20-44. Accordingly, the fact that ASORCNA relies on criminal penalties for the Act's enforcement does not, in and of itself, indicate a legislative intent to create a punitive scheme.

In light of the guidance provided by the Supreme Court in *Smith*, the court finds that the Alabama Legislature clearly expressed its nonpunitive intent and ASORCNA's other formal attributes do not sufficiently discount the deference that must be given to the Legislature's stated intent. As a result, the second step of the analysis must be examined.

### 2. *Second Step: Effects Analysis*

If the analysis ended with the Legislature's stated intent, the legislative branch would have pitched a shutout to the judicial branch. But the Supreme Court has recognized for centuries that what something is *called* and what something actually *is* may be two different things. Just so, in double jeopardy and ex post facto law, allowance is made for guardedly going behind expressed legislative intent to the reality of a legislatively created thing by

assessing the exposed purpose or effects of the thing.  Hence, we have the ancient observation that "[t]he Constitution deals with substance not shadows.  Its inhibition was levelled at the *thing*, not the *name*.  It intended that the rights of the citizen should be secure against deprivation for past conduct by legislative enactment, under any form, however distinguished." *Weaver v. Graham*, 450 U.S. 24, 28 (1981) (quoting *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325 (1866)) (emphasis added).  Thus, in the second step of the ex post facto analysis, the focus turns to whether this scheme is so punitive in purpose or effect as to negate the State's declared nonpunitive intent.

Admittedly, "[b]ecause we ordinarily defer to the legislature's stated intent, *only the clearest proof* will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *W.B.H.*, 664 F.3d at 855 (emphasis in original) (quoting *Smith*, 538 U.S. at 92).  The *clearest proof* standard is a heavy burden to carry:  "some evidence will not do; substantial evidence will not do; and a preponderance of the evidence will not do.  '[O]nly the clearest proof' will do." *Id.* (quoting *Smith*, 538 U.S. at 92).

Illustrating, however, that courts are not entirely shut out from an inquiry that goes beyond a legislature's stated intent, the Supreme Court in *Smith* applied the *Mendoza-Martinez* "guideposts." 538 U.S. at 97 (citing *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963)).  The *Mendoza-Martinez* factors, "which migrated into our ex post facto case law from double jeopardy jurisprudence," call on a court to analyze "whether, in its necessary operation, the regulatory scheme:  has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of

23

punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose." *Smith*, 538 U.S. at 97. These factors are only "guideposts" and are "neither exhaustive nor dispositive"; "[n]o one factor should be considered controlling as they 'may often point in differing directions.'" *Hudson v. United States*, 522 U.S. 93, 101 (1997) (quoting *Mendoza-Martinez*, 372 U.S. at 169). These factors are useful and will be applied in the following analysis.

a.    The Extent to Which Effects Are Analyzed

As a preliminary matter, the court must determine the extent to which ASORCNA's effects may be analyzed. The parties have taken diametrically opposed stands on this point. Mr. McGuire advocates for the consideration of each of ASORCNA's effects, including those felt by only one or two offenders at most, while Defendants argue that ASORCNA's implementation (a term used, in this context, synonymously with "effects") may not be considered at all in light of the requirement that a court look only to the statute on its face.[14] The court declines to follow either approach, rather, finding sufficient guidance in *Smith* and other Supreme Court precedent to establish the level of consideration necessary.

---

[14] The State ultimately relents in its approach to an extent by stating that, "[a]t most, [Mr. McGuire's] testimony is relevant only insofar as it describes a typical sex offender's experience under ASORCNA." (Doc. # 255, at 34.) Generally speaking, however, the State argues that implementation is irrelevant to determining whether the statute is punitive in purpose or effect. (*Id.*; *see also id.*, at 36 (stating that "the actual means [the Department of Public Safety] chose to implement [the license-notification] requirement are irrelevant" because "[t]he Court should . . . evaluate ASORCNA 'on its face'").)

As has been discussed, in *Smith*, the United States Supreme Court determined that the Alaska Sex Offender Registration Act did not violate the Ex Post Facto Clause of the Constitution.[15]  The Alaska statute required a sex offender to register with law enforcement and required law enforcement to notify community members of the sex offender's presence. Of particular importance, the majority examined the impact of the state's dissemination of registrants' information over the internet, despite the absence of any provision detailing how to make registrants' information public within the statute.   Specifically, the Court "acknowledged that notice of a criminal conviction subjects the offender to public shame, [with] the humiliation increasing in proportion to the extent of the publicity," but, because "[t]he purpose and the principal effect of notification are to inform the public for its own safety, [and] not to humiliate the offender, . . . the attendant humiliation [was] but a collateral consequence of a valid regulation."   *Id.*   The Court examined these *general* effects on offenders even though "[t]he Act [did] not specify the means by which the registry information [was to] be made public." *Id.* at 91.[16]

There is little difference between implementation of the internet-dissemination scheme in *Smith* and the Department of Public Safety's implementation of the travel-permit and

---

[15] Interestingly, the Supreme Court of Alaska later invalidated the very same law upheld in *Smith,* as an ex post facto violation of *Alaska's* constitution.  *See Doe v. Smith*, 189 P.3d 999 (Alaska 2008).

[16] In his concurrence, Justice Thomas took issue with the majority's decision to examine the effect of internet dissemination as part of the second-step analysis.  Specifically, he stated that, "[b]y considering whether Internet dissemination renders [the Alaska Act] punitive, the Court has strayed from the statute." *Smith*, at 538 U.S. at 107. Because the Act did not "specify a means of making registry information available to the public," the Court was not confining its analysis to the statute's face, and thus Justice Thomas disagreed with that particular section of the majority's opinion.  *Id.* at 106.

license-notification requirements under ASORCNA.  First, both statutes provide a grant of regulatory authority to the State's Department of Public Safety.  *Id.* at 96 (stating that the Alaska Act "vest[ed] the authority to promulgate implementing regulations with the Alaska Department of Public Safety"); Ala. Code § 15-20-44(c) ("The Director of the Department of Public Safety shall have the authority to promulgate any new rules as are necessary to implement and enforce [ASORCNA].").  Second, both *Smith* and the present analysis involve an examination of the Department of Public Safety's chosen means of implementing a provision within the statute. *See Smith*, 538 U.S. at 90 (noting that the Alaska statute required certain information, including offenders' names and addresses, be made available to the public); Ala. Code § 15-20A-15 (establishing travel restrictions); *id.* § 15-20A-18 (establishing identification requirements).  Based on the statutory delegation of regulatory authority and the specific provision in the statute under which the regulatory authority had been exercised, the *Smith* Court analyzed the actual means used to make the non-confidential material public, and this court will conduct a similar analysis regarding ASORCNA's travel-permit and license-notification requirements.

In contrast to the effects associated with the implementation of travel restrictions and license-notification requirements, the idiosyncratic effects[17] alleged by Mr. McGuire may not be used alone to uphold or defeat an ex post facto challenge.  Consideration of such

---

[17] "Idiosyncratic effects" is used as a synonym for those effects that are not experienced by all offenders, and which usually point to an "as-applied challenge."  As-applied challenges in ex post facto cases are directly barred by *Seling*.  To further distinguish idiosyncratic effects from the Department of Public Safety provisions mentioned above, idiosyncratic effects are not the result of statutorily authorized, general implementation.

idiosyncratic effects alone has been expressly rejected by the Supreme Court.  In *Seling v. Young*, the Court favorably quoted *Hudson v. United* States, in which it "expressly disapproved of evaluating the civil nature of an Act by reference to the effect that Act ha[d] on a single individual."  531 U.S. 250, 262 (2001).  The *Seling* Court went on to note that courts must instead "evaluate the question by reference to a variety of factors considered in relation to the statute on its face."  *Id.* (internal quotation marks omitted).

The *Seling* case signals why idiosyncratic effects cannot be used alone in upholding a challenge.  In that case, the Court determined that a statute that had already been characterized as facially nonpunitive could not be rendered punitive solely by its application to a single individual.  To hold otherwise, according to the Court, would be to "invite an end run around the [State] Supreme Court's [earlier] decision that the Act [was] civil."  *Id.* at 264.  Based on that analysis, it would be illogical to allow such a result in this case solely because Mr. McGuire presents the right set of idiosyncratic effects in ASORCNA's challenge before this court.  If this were allowed, cases presenting idiosyncratic effects would have disparate results from those examining purely general effects.

That said, idiosyncratic effects have been used in the negative to bolster a finding that a statute does not violate the Ex Post Facto Clause.  For example, the Supreme Court in *Hendricks* addressed the specific confinement to which the plaintiff in that case had been subjected by stating that, "[a]lthough the treatment program initially offered Hendricks may have seemed somewhat meager, it must be remembered that he was the first person committed under the Act."  521 U.S. at 367–68.  This statement acknowledged the idiosyncratic subpar treatment that the plaintiff received and cast the treatment as having only a minor impact on

27

the overall analysis.   Further, and as an additional example, the Third Circuit noted idiosyncratic effects in rejecting an ex post facto challenge to a sex offender registration scheme, stating that, "[a]lthough the record [in that case] reflect[ed] that personal injury and property damage from private violence ha[d] occurred, it also reflect[ed] that [those] occurrences [were] relatively rare." *E.B. v. Verniero*, 119 F.3d 1077, 1104 (3d Cir. 1997). By highlighting the idiosyncratic nature of specific persons' experiences, the *Hendricks* and *Verniero* courts provided additional support for rejecting the plaintiffs' ex post facto challenges.

The court finds that idiosyncratic effects may not be used alone to uphold or defeat Mr. McGuire's ex post facto challenge. Accordingly, the court will confine its consideration of such effects, *e.g.*, the "zones of exclusion" – Mr. McGuire's particular experience with homelessness, and Montgomery's lack of affordable or vacant housing – only to the extent that they explain or describe general effects flowing from the face or necessary operation of the statutory scheme.

A related but distinct consideration is the proper scope and focus of the examination of effects.  As *Smith* pointed out, "we must . . . examine  . . . the *statutory scheme* . . . ." 538 U.S. at 92 (emphasis added).   This instruction is particularly important in the case of ASORCNA because, to put it bluntly, it is the most comprehensive scheme, by far, in the United States.  It is unique and novel in scope.  No other state combines in-person registration, community notification, driver's license branding, residency restrictions, employment restrictions, travel restrictions, association with related children restrictions, weekly registration for the homeless, dual registration for all offenders in municipalities, and dual

weekly registration for all homeless offenders in municipalities (totaling up to 112 in-person registrations per year), undergirded by 115 felonious ways to violate the statutory scheme, life application, retroactive to infinity or eternity (whichever first occurs), and all of it (except very limited exceptions for relatively minor offenses) without risk assessments for general sex offenders (non-juvenile and non-predatory).

Alabama's scheme goes miles beyond the minimum federal requirements of the Sex Offender Registration Act ("SORNA"), recently reviewed in this Circuit in *United States v. W.B.H. See* 664 F.3d 848 (11th Cir. 2011). Many courts across the country have analyzed and ruled upon individual components that are included in Alabama's scheme, and in isolation, most have been upheld. But no court has ever been faced with analyzing *in toto* the general effects of a scheme this expansive.[18] Realizing this task early on, and in consideration of the court's reading of the law, the parties were notified that the court would examine the cumulative effects of the scheme as a whole to determine if the effects overrode stated intent.

Defendants objected to this approach. In fact, the State in particular objected to any trial on the facts: "[W]e believe this question is a purely legal one, not susceptible to courtroom fact-finding. . . . [W]e therefore object to holding a trial at all on the ground that it is unnecessary." (Trial Tr. I, at 18.) The court could find no controlling law holding that

---

[18] "Only 13 other states restrict residency . . . , only 15 other states restrict employment . . . , and only 9 restrict both residency and employment. No other state requires dual reporting to both the sheriff and the police department, and only one other state (Tennessee) contains travel restrictions. Only five other states are infinitely retroactive combined with lifetime application, meaning that the vast majority of states have some limit as to how far back or how far forward their provisions apply. Put together, there is not a single state that matches the cumulative and punitive effects of Alabama's ASORCNA – in fact, none even comes close." (Doc. # 256, at 37.)

the "clearest proof" standard applies only to legislative facts.   Because a burden of proof

suggests evidence, and the court knowing of no way to gather facts about the general effects

caused by the scheme on its face, nor a way to assess "*how effects of the Act are felt by those

subject to it . . .*", *Smith*, 538 U.S. at 99–100 (assessing the affirmative disability or restraint

prong) (emphasis added), the objections of the State were overruled at trial.

The State also took the position at trial that the effects must be examined exclusively

as to each provision individually, instead of cumulatively:

> THE COURT:  Are you aware of any law in the United States that has
> as many effects on an offender as the Alabama statute?
>
> MR. PARKER:  I am unaware only because I have not spent much time
> researching these statutes.   And I understand the plaintiffs have a chart.[19]
> We . . . obviously rely on the Court to do the research.  It's time-consuming.  I
> don't think it's necessary for purposes of this case.
>
> THE COURT:  You think that . . . because the State Legislature says it,
> that they can create unlimited effects and it not be excessive?
>
> MR. PARKER:  No, Your Honor.  We – the question, again, is whether
> the regulatory means chosen are reasonable in light of the nonpunitive
> objective.
>
> THE COURT:  That doesn't answer the excessive [sic] question.
>
> MR. PARKER:  Well, what I'm trying to say, Your Honor, is if you take
> each of these provisions and look at them, they each are reasonable in light of
> the regulatory means chosen.
>
> THE COURT:  So then you can have unlimited [effects on offenders] as
> long as each one stands alone as individual [sic].
>
> MR. PARKER:  Yes.  If that's your question, yes, that's how I see the
> law.

---

[19] In the record as Mr. McGuire's Exhibit 3.

(Trial Tr. I, at 25–26.)   The court was perplexed by the State's assertion that unlimited intersecting provisions and their effects would be constitutional.   First, this position would effectively bar courts from truly analyzing an act's effects.   What would there be for a court to do, then, but unquestioningly take the legislature at its word with regard to intent?   Second, taken to its extreme, even daily double-registration of city-dwelling homeless offenders – totaling 730 in-person registrations a year per homeless offender – would be, under this analysis, perfectly constitutional.   The argument ends in absurd results.

Wishing to avoid absurdity if at all possible, the court has settled on a blended analysis of the effects of ASORCNA.   First, each of the relevant statutory provisions will be examined in light of the *Mendoza-Martinez* factors.   Second, the scheme as a whole will be assessed for purpose and effects, taking into particular account its effect on homeless Alabama sex offenders.   This is so because the Constitution deals in substance not shadows, the nature of things, not just the name of things.

With these analytical contours in mind, the court now turns to the *Mendoza-Martinez* guideposts.

### b.   Whether, in Their Necessary Operation, ASORCNA's Provisions Have Been Regarded in Our History and Traditions as Punishment

Mr. McGuire argues that ASORCNA's requirements resemble various traditional forms of punishment.   Each suggested similarity will be addressed in turn.

### i.   Banishment

Mr. McGuire contends that ASORCNA's residency restrictions effectively create an "enormous zone of banishment."   (Doc. # 256, at 9.)   The Supreme Court in *Smith* recognized

31

banishment as a traditional form of colonial punishment.   538 U.S. at 98.  Since then several

courts have had the opportunity to explore how sex offender residency restrictions compare

to the historical practice.  *See Doe v. Miller*, 405 F.3d 700, 719 (8th Cir. 2005) (differentiating

residency restrictions from the practice of banishment); *Wallace v. New York*, No. 12-CV-

5866, 2014 WL 4243564, at *30 (E.D.N.Y. Aug. 28, 2014) (same); *Doe v. Baker*, No. 1:05-

CV-2265, 2006 WL 905368, *3 (N.D. Ga. Apr. 5, 2006) (same).  In comparing the historical

practice of banishment to Iowa's sex offender residency restrictions, the Eighth Circuit

explained that "banished offenders historically could not 'return to their original

community.'"  *Miller*, 405 F.3d at 719.  Similarly, the Court in *Smith* noted that "the

banishment of an offender expelled him from the community." 538 U.S. at 98.

       As Mr. McGuire has testified in this case, he is not barred from frequenting any part

of the city during the day.  (Doc. # 256, at 13.)  Rather, the restrictions only limit the places

in which an offender can establish a residence or apply for and accept employment.  There is

no complete exile from the City of Montgomery or from any other location within Alabama.

Thus, while Mr. McGuire is able to offer a troubling account of his inability to find viable

housing, he cannot show that he has been the subject of banishment in its historical form.

                          ii.      **Public Shaming**

       Mr.  McGuire next argues that two of ASORCNA's provisions resemble the traditional

punishment of public shaming.  First, Mr. McGuire asserts that by requiring the front of every

registrant driver's license to be branded with the words "CRIMINAL SEX OFFENDER" in

all capital, red letters, the State is subjecting registrants to "public embarrassment,

humiliation, and shaming."[20]  (Doc. # 256, at 25.)  In *Smith*, the Supreme Court explored the historical practice of public shaming in light of Alaska's sex offender community notification provisions and recognized that "[s]ome colonial punishments indeed were meant to inflict public disgrace."  538 U.S. at 98.  However, the Court narrowed its description of public shaming, noting that such punishments were historically carried out by holding "the person up before his fellow citizens for face-to-face shaming."  *Id*.

The red-lettered labelling of registrant driver's licenses is no doubt an aggressive provision.  Mr. McGuire illustrated how the required red lettering on his driver's license leads to shame and embarrassment in ordinary, everyday encounters with the public:

> ANSWER:  Well, first of all, without – just having the license itself is a reminder every day that you're being punished.  You're being – I don't know if the correct word is "ostracized."  But with that said, I had an experience just recently at a Dollar General Store.  I used my credit card to purchase some groceries; and the clerk asked me for my driver's license, so I showed it to him.  And he held it up to compare it with my credit card, and he looked at it and he looked at me again.  And he handed it back to me.  He said, how long have you been locked up?  And I found that just to be repulsive.  I felt very ashamed, very embarrassed.

> QUESTION:  In what kinds of situations do other folks have to look at your driver's license?

> ANSWER:  Cashing checks.  Or I might pick up some items that my wife would order on line from Walmart, and I have to go to Walmart and show my identification.

---

[20] Defendants object to the court's evaluation of the identification card requirement, arguing that the requirement that registrant driver's licenses be inscribed with "CRIMINAL SEX OFFENDER" is not a provision of ASORCNA on its face but a means of implementation as promulgated by the Department of Public Safety.  The court, however, has already addressed this argument, finding that the Department's decision in this regard is indistinguishable from the implementation of the internet registry in *Smith* and may be considered among ASORCNA's other non-idiosyncratic effects.

> QUESTION:  In fact, you've had to show your driver's license here in the past three days to get into this very building; isn't that right, Mr. McGuire?

> ANSWER:  That's correct.

(Trial Tr. III, at 35.)  In fact, the only other red lettering that appears on an Alabama driver's license is the State's name.

However, important differences exist between ASORCNA's license-labelling requirement and the "scarlet-letter-type punishment" referenced by the Eleventh Circuit in *W.B.H.*  664 F.3d at 855.  Offenders have some degree of control over when and where to present an identification, unlike those during colonial times who had their transgressions aired publicly at all times, without any power to contain or control the extent or timing of the humiliation.  Thus, while there may be other constitutional concerns with requiring registrants to carry a branded license, the court cannot say that the license-labelling provision is closely analogous to the historical practice of public shaming.

Mr. McGuire also contends that ASORCNA's community-notification provisions effectively amount to public shaming.  Both the Supreme Court and the Eleventh Circuit have assessed the use of online, sex-offender registries in light of the traditional practice of public shaming, and each found sufficient differences between the historical punishment and modern registry regimes.  *Smith*, 538 U.S. at 98 ("[T]he stigma of Alaska's Megan Laws results not from public display or ridicule and shaming but from the dissemination of accurate information about a criminal record, most of which is already public."); *W.B.H.* 664 F.3d at 855 ("The registries do not 'stage[ ] a direct confrontation between the offender and the public.'").  Mr. McGuire, however, argues that ASORCNA far exceeds passive dissemination

of truthful information, as authorized by *Smith* and *W.B.H.*, because ASORCNA requires law-enforcement officers to notify every resident within a specific distance that a registrant has moved into the neighborhood, as well as every school and childcare facility in a three-mile radius of the registrant's residency.  Mr. McGuire notes that alongside the notification, each applicable party is also provided his picture, address, and a physical description.

It is true that the Court in *Smith* assessed a community-notification scheme that existed entirely online, with interested residents needing to take the "initial step" to search out information on registered sex offenders via the state's website.  In the case of ASORCNA, members of law enforcement are required to actively disseminate community-notification flyers to geographically applicable residences, schools, and childcare facilities.  But, just as in Alaska, the stigma that results from ASORCNA's community-notification scheme flows from the "dissemination of accurate information about a criminal record, most of which is already public" and not from organized episodes of "face-to-face shaming."  538 U.S. at 98. Additionally, the Court in *W.B.H.* expressly stated that "registries do not 'stage[ ] direct confrontation between the offender and the public'" and the same is true of the dissemination of flyers.  *W.B.H.,* 664 F.3d at 855.  Accordingly, because ASORCNA's community-notification flyers, like the registries in *Smith* and *W.B.H.*, serve to inform the applicable public of truthful information in furtherance of public safety and do not initiate public displays of shaming, any comparison to the historical punishment of public shaming is attenuated.

### iii.    Parole and Probation

Mr. McGuire also contends that the requirements imposed by ASORCNA resemble the traditional punishments of parole and probation.  To support his assertion, Mr. McGuire

relies on a single Ohio district court case, *Mikaloff v. Walsh*.[21]  No. 5:06-CV-96, 2007 WL 2572268 (N.D. Ohio Sept. 4, 2007).  In *Mikaloff*, the court found Ohio's sex offender residency restriction to be sufficiently "analogous to the residency restrictions typical to probation and parole" because it gave law enforcement a perpetual, blanket veto power over registrants' housing and did not provide a grandfather clause.  *Id*. at *9 (explaining that "subjecting a sex offender to constant ouster from his or her home seem[ed like] a significant deprivation of liberty and property interests," because "[i]t sentenced [him or her] to a life of transience [and] forc[ed] them to become nomads").

Mr. McGuire alleges that ASORCNA's requirements are equally analogous to parole and probation as the provision analyzed in *Mikaloff*.  Specifically, he argues that ASORCNA gives Alabama's law enforcement veto power over where a sex offender may reside, requires registrants to maintain constant contact with law enforcement, provides for criminal punishment upon violation, and restricts employment and travel.  Two important differences exist, however, between the residency restriction dissected in *Mikaloff* and ASORCNA's provisions.  First, ASORCNA's residency restrictions do not create the risk that offenders will be "sentence[d] . . . to a life of transience" as Judge Gwin feared was possible in *Mikaloff*. 2007 WL 2572268, at *10. Unlike Ohio's residency restriction, ASORCNA explicitly states that "[c]hanges to property within 2,000 feet of a registered address of an adult sex offender which occur after the adult sex offender establishes residency shall not form the basis for

---

[21] Importantly, the court in *Mikaloff* used a different standard than the one applicable in this case.  In *Mikaloff*, the court initially determined that the Ohio Legislature's intent was ambiguous in enacting the residency restriction, and as a result, did not apply the "clearest proof" standard during the second step of the ex post facto analysis.  2007 WL 2572268, at *5.

finding that the adult sex offender is in violation" of the residency restrictions.  Ala. Code §
15-20A-11(c).  Second, while ASORCNA openly restricts a registrant's housing options and
requires registrants to notify authorities of residential changes, no requirement exists that the
offender must seek law-enforcement permission before making residency decisions.  As a
result, law enforcement is not given the same discretionary "veto power" that was described
in *Mikaloff*. [22]

Additionally, the Supreme Court provided some analytical assistance when it
compared Alaska's registration scheme to probation and supervised release for the purpose of
determining whether Alaska's statute imposed an affirmative restraint on sex offenders.[23]  The
Court noted that "[p]robation and supervised release entail a series of mandatory conditions
and allow the supervising officer to seek the revocation of probation or release in the case of
infraction," while Alaska registrants are free from direct supervision and any failure to comply
with the reporting requirements would result in a criminal proceeding "separate from the
individual's original offense."  *Smith*, 538 U.S. at 101–02.  Like the enforcement features in
*Smith,* any prosecution for violating ASORCNA would occur in a proceeding entirely separate
from the registrant's original offense.  Indeed, "unlike the restraints imposed on those who

---

[22] This distinction is important because permission connotes discretion by a law-enforcement
official to grant or deny a request.  Thus, requiring permission from a law-enforcement official would
be similar to allowing direct and discretionary supervision over a parolee. The Supreme Court in
*Smith* recognized the nuanced difference between permission and notification when it noted that,
"[a]lthough registrants must inform the authorities after they change their facial features (such as
growing a beard), borrow a car, or seek psychiatric treatment, they are not required to seek permission
to do so."  538 U.S. at 101.

[23] The Supreme Court discussed the relative similarities at this juncture and not during the
"historical forms of punishment" analysis, despite comparing other provisions of the Alaska statute
to banishment and public shaming.

are on probation or supervised release, [ASORCNA's requirements] are not conditions of release the violation of which could result in revocation and imposition of imprisonment without new criminal charges and another trial." *W.B.H.*, 664 F.3d at 857.  This distinction, as highlighted by the Supreme Court, coupled with the aforementioned differences between ASORCNA and the *Milakoff* scheme, necessitates a finding that ASORCNA is insufficiently similar to parole and probation.

### iv.    Fines

Lastly, Mr. McGuire asserts that ASORCNA's registration fees are similar to the traditional punishment of fines.  For support, Mr. McGuire relies on *Doe v. Raemisch*, 895 F. Supp. 2d 897 (E.D. Wisc. 2013), in which a $100 annual registration fee was determined to be a punitive fine that violated the Ex Post Facto Clause.  According to the court in that case, although the funds were assessed "to offset the costs of monitoring the offenders," that nonpunitive purpose did "not eliminate the penal aspect of the assessment," and "singl[ing] out individuals who have prior convictions for sexual assaults as the sole source of such funds [could] only be seen as punitive." *Id.* at 909.

The Seventh Circuit, however, reversed the district court on that point, stating that:

[t]he burden of proving that [a registration fee] is a fine is on the plaintiffs, and since they [had] presented no evidence that [the registration fee] was intended as a fine, they [could not] get to first base without evidence that [the fee] was grossly disproportionate to the annual cost of keeping track of a sex offender registrant—and they have presented no evidence of that either.

*Mueller v. Raemisch,* 740 F.3d 1128, 1134 (7th Cir. 2014) (internal citations omitted).  The Seventh Circuit went on note that "Wisconsin's $100 fee [was] the same as that of a neighboring state, Illinois, albeit higher than the fees charged by Idaho ($80) and

Massachusetts ($75)." *Id.*  Further, it stated that "[t]he state provides a service to the law-abiding public by maintaining a sex-offender registry, but there would be no service and hence no expense were there no sex offenders." *Id.* at 1135. Thus, because the registrants "are responsible for the expense, there is nothing punitive about requiring them to defray it." *Id.*

The *Mueller* court's reasoning is persuasive.  Alabama assesses a $10 fee per quarterly registration, thus establishing a baseline fee of $40 per year.   Ala. Code § 15-20A-22.  Admittedly, if the registrant lives in a municipality, then the registrant will have to pay the fee to both the local police department and the sheriff's department, thus amounting to $80 per year. *Id.*  And, as Mr. McGuire points out, if the registrant happens to work, live, and attend school at the same time in different counties, the registrant would presumably face a potential annual assessment of $240.[24]  Despite the potential burden created by these fees, however, Mr. McGuire has presented no evidence suggesting that the fees are "so high that [they] must be . . . fine[s]." *Mueller*, 740 F.3d at 1134.  In addition, the *Mueller* court's reasoning that "there is nothing punitive about requiring [offenders] to defray" costs for which the offenders are responsible is persuasive. *Id.* at 1135.  Because ASORCNA's fees are used to offset the costs of the regulatory scheme, they do not resemble the traditional punishment of fines.

In summary, while several of ASORCNA's provisions share features with some of our nation's traditional forms of punishment, this analysis has indicated that important variances also exist between ASORCNA's provisions and historical punishments.  Ultimately, no

---

[24] This calculation assumes that registration would be required in both a city and county for each of the registrant's places of employment, schooling, and residence.

ASORCNA provision is sufficiently analogous to an early form of punishment.  Thus, the first factor points to a finding that ASORCNA is nonpunitive.

### c. Whether, in Their Necessary Operation, ASORCNA's Provisions Impose an Affirmative Disability or Restraint

The second guidepost requires a court to "consider whether [an act] subjects [its challenger] to an 'affirmative disability or restraint.'"  *Smith*, 538 U.S. at 100 (quoting *Mendoza-Martinez*, 372 U.S. at 168).  At this stage, a court examines "how the effects of the [a]ct are felt by those subject to it."  *Id.* at 100–01.  The Supreme Court has noted that, "[i]f the disability or restraint is minor and indirect, its effects are unlikely to be punitive."  *Id.* at 101.

When evaluating the effects of Alaska's act, the Supreme Court in *Smith* began by noting that Alaska's sex offenders were not physically restrained in any way, thereby distinguishing the statutory scheme from the "paradigmatic affirmative disability or restraint" – imprisonment.  *Id.*  In fact, the Court noted that the use of a public registry did not impose an affirmative restraint because it did not "restrain activities sex offenders may pursue" and instead left "them free to change jobs and residences."  *Id.*  Additionally, the act did not impose an affirmative disability in requiring registrants to provide periodic updates and notifications because there was nothing in the act's text that required the updates to be made in person.  *Id.*

In *W.B.H.*, the Eleventh Circuit evaluated SORNA's federal registration requirements in light of the guidance provided by the Supreme Court in *Smith*, and ultimately held that, as in *Smith*, SORNA "impose[d] only a minor and indirect disability or restraint on adult sex

offenders." *W.B.H.*, 664 F.3d at 856–57.  Like Alaska's statute, the court noted that "SORNA does not prohibit changes, it only requires that changes be reported." *Id*. at 857.  Further, the Eleventh Circuit expressly rejected the idea that *Smith* stood for the notion that in-person updates and notifications would amount to a per se affirmative disability.  *Id*.  Specifically, the court explained that "[a]ppearing in person may be more inconvenient" but the increased inconvenience did not make the requirement punitive.  *Id*.

Mr. McGuire contends that ASORCNA's residency, employment, and travel restrictions, as well as its in-person registration requirements, go beyond the provisions analyzed in *Smith* and *W.B.H.* and impose affirmative disabilities or restraints on registrants.[25] In large part, the court agrees and finds that ASORCNA's residency, employment, and travel restrictions, as well as its in-person registration requirements, rise beyond the minor and indirect impositions examined in *Smith* and *W.B.H.*  Accordingly, the second guidepost, unlike the first, weighs in favor of the conclusion that certain ASORCNA provisions are "'so punitive either in purpose or effect' [as] to override [Alabama's] intent that it be a civil regulatory statute."  *Id*. at 858 (quoting *Smith*, 538 U.S. at 92).

While the Supreme Court in *Smith* noted that Alaska's requirements had not "led to substantial occupational or housing disadvantages for former sex offenders that would not have otherwise occurred," that is not the case here.  538 U.S. at 100.  Rather, like the plaintiffs in *Doe v. Miller*, Mr. McGuire has shown that he would live with his wife and not under a

---

[25] In his pending motion for summary judgment, Mr. McGuire briefly argues that the registration fees also constitute an affirmative disability or restraint.  Reviewing the record, however, Mr. McGuire, appears to have abandoned this argument.

bridge absent ASORCNA's residency restrictions. *See* 405 F.3d at 721. ("Although the [plaintiffs] did not present much evidence about housing within restricted areas that would have been available to them absent the statute, they did show that some sex offenders would have lived with spouses or parents in the restricted zones . . . ."). In *Miller*, the Eighth Circuit considered the degree of the restraint on the sex offenders' residency options to conclude that Iowa's statute did "impose an element of affirmative disability or restraint." *Id*.[26]

Here, ASORCNA also bars offenders from living with most minors, including nieces and nephews, regardless of whether an offender's past crime involved children as victims. Moreover, Mr. McGuire testified that he has been forced to turn down employment at various venues because of their location within restricted zones.[27] Additionally, ASORCNA's requirement that an offender seek a permit before traveling restrains him or her from traveling spontaneously. These are direct, non-minor restraints and disabilities felt by those subject to them.

To keep idiosyncratic effects in their proper perspective, not *every* registrant will feel *every* restraint of the statute in the same way as *all* other registrants. However, Mr. McGuire's experience is illustrative of the general effects of ASORCNA's scheme in its necessary operation. For example, no registrant can stay, even one night, in a residence with minor

---

[26] After acknowledging the presence of an affirmative disability or restraint, the Eighth Circuit in *Miller* qualified its analysis on this particular guidepost, believing that *Kansas v. Hendricks*, 521 U.S. 346 (1997), downplayed the restriction's relative level of restraint or disability in light of the importance of the restriction's rational relation to a nonpunitive purpose. 405 F.3d at 721. The latter inquiry, however, is a separate guidepost, distinct from the affirmative disability or restraint analysis.

[27] The decrease in employment opportunities mentioned here is a general effect arising from the explicit text of the statute – an effect that is necessarily faced by all offenders.

nieces or nephews or in the home of a child or parent that is located in a restricted area.  It is therefore reasonable to conclude that most registrants have been forced to deem certain residential options off limits in light of ASORCNA.  Similarly, every registrant is barred from accepting employment within 2,000 feet of a school or daycare.  Accordingly, every registrant has had the number of potential employers diminished based on nothing more than geographic proximity.

As to Mr. McGuire's contention that ASORCNA's in-person registration requirements impose an affirmative disability, *W.B.H.* forecloses the argument that an in-person registration requirement per se is an affirmative disability or restraint.  But *W.B.H.* does not indicate that in-person registration, if required frequently enough, could never amount to an affirmative disability or restraint.  While the court in *W.B.H.* analyzed the federal statutory regime that requires in-person registration on the same quarterly basis as ASORCNA, it did not speak to a statutory scheme that requires in-person, weekly dual registrations for in-town homeless registrants.  Such a requirement amounts to 112 required registrations per year, when one includes the base-line quarterly registrations. [28]  If requiring 112 in-person registrations per year does not amount to an affirmative disability, it is difficult to envision what, besides incarceration, would qualify.

---

[28] Mr. McGuire asks the court to find that the in-person registration requirement is an affirmative disability in its own right because the statute allegedly "forc[es] [him] to walk or get a ride for 20 miles every week."  (Doc. # 256, at 46.)  The court, however, finds that ASORCNA has not "forced" Mr. McGuire to make such a long trek on foot, though on occasion he has been required to suffer that hardship.  The circumstance of traveling 20 miles for registration is idiosyncratic to Mr. McGuire, and will not support a finding of affirmative restraint or disability.

43

As a result, the court finds that the residency, employment, and travel restrictions generally, as well as dual weekly registrations for in-town homeless registrants specifically, are affirmative disabilities and restraints, and thus this factor points in favor of finding those restrictions punitive.

> ### d.    Whether, in Their Necessary Operation, ASORCNA's Provisions Promote the Traditional Aims of Punishment

In cases challenging sex offender regulations, "traditional aims of punishment" means almost exclusively the concepts of deterrence[29] and retribution.  The evidence, particularly the expert testimony presented by each side, was sharply, indeed irrevocably, contradictory.  In the end, Mr. McGuire proved only one thing by the clearest proof regarding recidivism, namely, that nothing is clear.  This lack of clarity was the foundation of the testimony of the expert witness for the state, Dr. Richard McCleary:

> QUESTION:  In your opinion, based on the research, do sex offender registration and notification laws have a general deterrent effect?

> ANSWER:  . . . . I'm an agnostic on it . . . . I've read everything that's out there.  It's just too – too ambiguous to draw any conclusion from.

(Trial Tr. III, at 152.)  Mr. McGuire's expert, Dr. James J. Prescott, testified that being listed on a sex offender registry actually *increases* recidivism.  (Trial Tr. I, at 138.)

The confusion in the academy (social sciences, criminology, and even economics and law) points to the unreliability, and perhaps falsity, of some prominent statements in high-profile cases:

---

[29] Specific deterrence, as opposed to general deterrence, is bound up in the science of recidivism.  There is no uniform definition of recidivism, which makes accurate comparison and contrast of facially competing studies a virtual impossibility.

> There are potentially other false messages that are so deeply entrenched in sex offender legislation that it will be difficult to lessen their impact or excise the sentiments from the jurisprudence.   First is the claim that sex offenders recidivate in larger numbers than other offenders.  In *Doe v. Poritz* [662 A.2d 367 (N.J. 1995)], the New Jersey Supreme Court endorsed studies that reported recidivism rates of sex offenders at upwards of 40% to 52%.  The United States Supreme Court applied the *Poritz* gloss in [*Smith*] to conclude that recidivism posed by sex offenders generally is frighteningly high.  Yet, Bureau of Justice Statistics for roughly the same timeframe as *Poritz* do not support the conclusion that sex offenders recidivate more than non-sex offenders. Of the 9,691 male sex offenders released from prison in 15 States in 1994, 5.3% were rearrested for a new sex crime within 3 years of release.  In fact, sex offenders were less likely than non-sex offenders to be rearrested for any offense–43 percent of sex offenders versus 68 percent of non-sex offenders.  And in a separate study detailing 272,111 former inmates who were discharged in 1994, the lowest re-arrest rates were for those previously in prison for homicide or rape, while the highest re-offense rates were for those previously convicted of property crimes.

Catherine L. Carpenter, *Legislative Epidemics: A Cautionary Tale of Criminal Laws that Have Swept the Country*, 58 Buff. L. Rev. 1, 57–58 (2010) (internal citations and quotations omitted).

In any event, Mr. McGuire did not meet his high burden required to establish that ASORCNA promotes the traditional aims of punishment.  A review of the specific arguments of the parties confirms that conclusion.

Mr. McGuire argues that "[o]ne of ASORCNA's key objectives is to deter crime" while the "ASORCNA residency and other restrictions promote the traditional aim of retribution."  (Doc. # 171, at 47.)  In particular, based on the statute's language, only ASORCNA's registration and notification requirements act as a deterrent.  Thus, the fact that "ASORCNA imposes additional residency, employment, and travel *restrictions* on registrants

indiscriminately" has the sole function of "exact[ing] justice on the unpopular class [of sex offenders]." (Doc. # 171, at 49 (emphasis in original).) Because the additional restrictions are indiscriminate and "do nothing to affect future conduct or solve problems," those restrictions are retributive. (Doc. # 171, at 49.) Moreover, Mr. McGuire argues that ASORCNA's lack of a risk assessment, lack of a time limit, and inclusion of 115 felonies evidence a retributive purpose. (Doc. # 171, at 20, 49.) Further, Mr. McGuire argues that the relief provisions in ASORCNA promote retribution because "every provision under which a registrant may seek relief requires engagement of the prosecuting attorney in the jurisdiction where the registrant's sex crime was adjudicated, and for which he became subject to the statute," and because "ASORCNA mandates the state contact the victim of the registrant's original crime" before granting relief, "despite the fact that ASORCNA prohibits registrants from any contact with his or her victim." (Doc. # 171, at 49–50.) Finally, "[r]egistrants . . . are punished in ways they never were before [under ASORCNA]—even worse than parole," because, for example, Mr. McGuire "is forbidden from living with his own nieces, a punishment not in place while he was on parole." (Doc. # 256, at 46.)[30]

In response, the State argues that "the Legislature did not express a purpose of *general* deterrence as might motivate the passage of a criminal statute," but instead "spoke only of a goal to 'deter *sex offenders* from future crimes.'" (Doc. # 167, at 42 (emphasis in original) (quoting Ala. Code § 15-20A-2(1)).) Indeed, according to the State's expert, "'[c]ompared to the threat of long-term incarceration, it seems unlikely that the incremental pain threated by a

---

[30] Mr. McGuire briefly asserts, but fails to develop, an argument that registration and the license-notification requirements are retributive. (Doc. # 171, at 20.)

[sex-offender registration and notification] law . . . would weigh heavily in an individual's decision to commit (or not commit) a sex crime,'" and thus "'there is no theoretical reason to believe that [sex-offender registration and notification] laws have general deterrent effects.'" (Doc. # 263, at 20 (quoting Doc. # 166-21 at 29).)   Further, the State argues that "the Court was correct to hold [in its opinion at the Motion-to-Dismiss stage] that 'a deterrent purpose will not necessarily render a registration requirement punitive, and an incidental deterrent effect will not do so either.'"  (Doc. # 167, at 42 (quoting Doc. # 112, at 17).)  Thus, "to whatever extent ASORCNA promotes deterrence, that fact cannot supply the 'clearest proof' McGuire needs to prevail."  (Doc. # 167, at 42.)

Finally, the State contends that "McGuire would say that ASORCNA is retributive for the . . . reason that it regulates sex offenders as a single class, not based on the risk that they might individually pose."  (Doc. # 167, at 43.)  To the State, this anticipated argument is the opposite of *Smith*, where the plaintiff "argued that Alaska's law was retributive precisely because the length of the reporting requirement 'appear[ed] to be measured by the extent of the wrongdoing, not by the extent of the risk posed.'"  (Doc. # 167, at 43 (alteration in original) (quoting *Smith*, 538 U.S. at 102).)  The State notes that the *Smith* Court "rejected this argument, concluding that 'broad categories [of sex offender classification,] . . . and the corresponding length of the reporting requirement, are reasonably related to the danger of recidivism, and [were therefore] consistent with the regulatory objective.'"  (Doc. # 167, at 43 (alterations in original) (quoting *Smith*, 538 U.S. at 102).)  Thus, the State contends, "[a]rguments like this, of the 'heads-I-win-tails-you-lose' variety, just underscore the

importance of deferring to the legislature's stated purpose, and do not deserve to be taken seriously given their ease of manipulation." (Doc. # 167, at 43.)

The court finds that, to the extent there is some deterrent purpose in the statute, that deterrent purpose is similar to "[a]ny number of governmental programs [that] might deter crime without imposing punishment." *Smith*, 538 U.S. at 102.  Further, the court finds that Mr. McGuire has failed in his burden to prove that the restriction, felony, and relief provisions serve a retributive purpose.

As to deterrence, the potential that the registration and notification scheme under ASORCNA might deter the general population arises from the theoretical argument that a potential offender would avoid committing a crime because he or she did not wish to be subjected to the regulatory requirements of ASORCNA.  However, this is precisely the general deterrent effect of any governmental regulatory program. *See id.*  It is not possible to distinguish between this theoretical probability and the probability of deterrence discussed in *Smith*. Thus, the court finds that any general deterrent purpose of the statute is unremarkable in a regulatory scheme.

As to retribution, Mr. McGuire did not prove that the restriction, felony, and relief provisions of ASORCNA clearly serve a retributive purpose.  Using the parties' definition of retribution, "'[r]etribution is vengeance for its own sake.  It does not seek to affect future conduct or solve any problem except realizing justice.'" *Mikaloff*, 2007 WL 2572268, at *11 (quoting *State v. Cook*, 700 N.E.2d 570, 583 (Ohio 1998)).  "The absence of . . . a [scienter] requirement . . . is evidence that [restrictions] under [a] statute [are] not intended to be retributive." *Hendricks*, 521 U.S. at 362.  Both the Supreme Court and the Eleventh Circuit

have analyzed the retributive purpose of a statute in terms of whether the "regulatory regime as a whole . . . was 'reasonably related to the danger of recidivism' and 'consistent with the regulatory objective.'" *W.B.H.*, 664 F.3d at 858 (quoting *Smith*, 538 U.S. at 102).

The court first finds that the restrictions and felony consequences placed on registrants by ASORCNA cannot be said to be "'vengeance for its own sake.'" *Mikaloff*, 2007 WL 2572268, at *11 (quoting *Cook*, 700 N.E.2d at 583). ASORCNA seeks to regulate offenders' interactions with society and reduce recidivism. Specifically, the Alabama Legislature enacted employment and residency restrictions to "further[ ] the primary governmental interest of protecting vulnerable populations, particularly children." Ala. Code § 15-20A-2(5). The felony provisions serve to ensure guidance with the restrictions so that the regulatory purpose will be achieved. Thus, the restrictions and felony provisions "'seek to affect future conduct [and] solve [the] problem'" of protecting vulnerable populations. *Mikaloff*, 2007 WL 2572268, at *11 (quoting *Cook*, 700 N.E.2d at 583).[31] Importantly, there is no "increase[ ] [in the restrictions based on] the severity of the offender's prior conviction," and, to the extent that ASORCNA "seeks to 'revisit past crimes,'" "all sex-offender registration statutes do so in the same sense," because "a conviction for a past crime is a predicate" for application of the regulatory regime. *W.B.H.*, 664 F.3d at 858.

---

[31] This case differs from *Mikaloff* because ASORCNA does not require "[a] feeble, aging paraplegic [to] leave his home [upon a government action for ouster]." 2007 WL 2572268, at *11. This "lack of any case-by-case determination" was the focus of the *Mikaloff* court's retribution analysis. *Id.* By contrast, and to the extent this is a proper inquiry under this factor, ASORCNA does not force offenders to change residences because of subsequent property changes, and ASORCNA provides relief to terminally ill and permanently immobile persons. *See* Ala. Code §§ 15-20A-11(c), -23.

The Legislature's finding that employment and residency restrictions help achieve these regulatory objectives by limiting the potential for isolated contact between offenders and vulnerable populations is due deference, especially in view of Mr. McGuire's heavy burden of proof. Further, the potential for Class C felonies encourages compliance. Thus, the restrictions and the felony provisions are consistent with the statute's regulatory objective and "are reasonably related to the danger of recidivism." *Smith*, 538 U.S. at 102.

The court similarly finds that Mr. McGuire did not carry his burden to prove that ASORCNA's lifetime application and lack of any risk assessment are inconsistent with the statute's regulatory objective. The State made categorical determinations of how to regulate offenders. Although the risk of recidivism might be very low for an aged offender like Mr. McGuire whose only offense is nearly 30 years old, the Circuit has observed that, "a lower rate of recidivism is not the same thing as no recidivism." *W.B.H.*, 664 F.3d at 860. Further, the categorical approach, which lacks a scienter requirement, suggests a non-retributive purpose. *Hendricks*, 521 U.S. at 362. In light of the consequences attributable to sex-offender recidivism, the State's categorical approach has not been shown by the clearest proof to be unrelated to the danger of recidivism.

Finally, the court rejects Mr. McGuire's argument that the statute's relief provisions evidence a retributive purpose. Mr. McGuire's argument attacks the relief provisions as being so strictly confined as to show that the State meant the restrictions to be retributive. First, the State made the choice to include relief provisions, thus including certain situations in which a registrant could be relieved of the restrictions. The State's choice in this regard does not evidence a traditional aim of punishment; rather, the opposite is true: A State bent solely on

punishment would be disinclined to allow for such relief.  Second, any retributive purpose associated with the strict limitations on relief "are reasonably related to the danger of recidivism." *Smith*, 538 U.S. at 102.  Indeed, one would necessarily question the efficacy of a regulatory regime that would make it easy for the regulated persons to escape the regulatory requirements.  Here, the State enacted a number of relief provisions for various reasons, but the State also made those relief provisions narrow in order to retain the regulatory impact of the overall scheme.  Thus, the court rejects Mr. McGuire's argument that the statute's relief provisions evidence a retributive purpose.[32]

In sum, Mr. McGuire failed to establish by the clearest proof that the restriction, felony provisions, and relief provisions evidence a retributive purpose.  Further, to the extent ASORCNA has a deterrent purpose, that purpose is similar to the purpose of "[a]ny number

---

[32] To the extent Mr. McGuire argues that ASORCNA is more retributive than the statute in *Hendricks* because ASORCNA only punishes those who are convicted rather than including both persons who were convicted and who were not convicted (as was the case in *Hendricks*), the court disagrees.  Instead, the statute in *Hendricks* is susceptible to an argument that the law sought to exact punishment for past conduct.  Specifically, the statute in *Hendricks* would allow the State to exact retribution from conduct it deemed offensive without demanding a criminal conviction; indeed, *Hendricks* employs this reasoning in requiring additional safeguards to withstand constitutional scrutiny.  *See* 521 U.S. at 368–69 ("Where the State has 'disavowed any punitive intent'; limited confinement to a small segment of particularly dangerous individuals; *provided strict procedural safeguards*; directed that confined persons be segregated from the general prison population and afforded the same status as others who have been civilly committed; recommended treatment if such is possible; *and permitted release upon a showing that the individual is no longer dangerous or mentally impaired*, we cannot say that it acted with punitive intent." (emphasis added)).  ASORCNA is less susceptible to such an attack because the regulatory regime is only triggered upon a conviction – after the State has already established the conduct as a violation and after exacting whatever sentence would therefore be attached – and is broadly applicable rather than focused on the actual nature of the past conduct.

of governmental programs [that] might deter crime without imposing punishment." *Smith*, 538 U.S. at 102. Therefore, this factor points to a finding that ASORCNA is nonpunitive.

> ### e. Whether, in Their Necessary Operation, ASORCNA's Provisions Have Rational Connections to Nonpunitive Purposes

Whether the challenged provisions of an act have rational connections to the asserted nonpunitive purposes "is a '[m]ost significant' factor in [a court's] determination that the statute's effects are not punitive." *Smith*, 538 U.S. at 102 (quoting *United States v. Ursery*, 518 U.S. 267, 290 (1996)). Importantly, "[a] statute is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance." *Id.* at 103. However, sufficient imprecision between the challenged provisions and the nonpunitive purpose may ultimately "suggest that the Act's nonpunitive purpose is a 'sham or mere pretext.'" *Id.* (quoting *Hendricks*, 521 U.S. at 371 (Kennedy, J., concurring)).[33]

Mr. McGuire argues that several of ASORCNA's most prohibitive restrictions not only lack a close fit to the nonpunitive aims expressed by Alabama's Legislature, but, in actuality, entirely fail to further the aim of protecting the public and children.[34] Admittedly, Mr.

---

[33] Mr. McGuire asserts that Defendants bear the burden of proving this factor. (Doc. # 256, at 14–15.) However, the language of the test appears to be an analytical feature, and a reading that puts the burden on Defendants would conflict with the heavy burden Mr. McGuire must overcome to show that, by the clearest proof, ASORCNA is so punitive in its purpose or effects as to override stated nonpunitive intent. Therefore, the proper inquiry is whether Mr. McGuire has shown the absence of a rational connection.

[34] Mr. McGuire highlights the testimony of a law-enforcement officer to establish a tenuous connection between ASORCNA and its stated nonpunitive purpose. (*See, e.g.*, Doc. # 256, at 51 ("Lieutenant Persky, for example, admitted confusion about a law that punishes registrants by preventing them from staying three nights at any home near a school when that same law allows registrants to be near the school during the day, when children are present.").) The testimony, however, is minimally helpful at best. Law-enforcement officials' responsibility is to enforce the law, not to interpret it or to pass judgment on its rationality.

McGuire is able to point to some questionable aspects of ASORCNA. For example, the residency and employment restrictions do not prohibit registrants from spending virtually unlimited amounts of time day or night within the restricted zones. While a registrant would be barred from sleeping at a residence within 2,000 feet of a school, nothing in ASORCNA would make it a crime for the registrant to spend all of his or her waking, daytime hours at that same residence, purportedly while school children would be nearby. Moreover, ASORCNA does not differentiate between registrants who committed sexual offenses against children and those who committed offenses against adults. All registrants are restricted from working or living within 2,000 feet of schools and daycares regardless of whether they have ever been convicted of a crime against a child. And no one has attempted to rationalize why, in view of the public safety rationale, Mr. McGuire and married registrants like him may spend two consecutive nights, not to exceed nine a month, in a restricted residence with a spouse.

Further, the statute applies for life and does not include an individualized risk assessment. As a result, registrants who pose no discernable threat to public safety are subject to ASORCNA, notwithstanding evidence of post-conviction rehabilitation and subsequent years of non-offending. Mr. McGuire contends that such an extensive categorical approach harms public safety because it forces law enforcement to broadly distribute finite monitoring resources, leaving it unable to sufficiently focus on those who actually pose an ongoing risk. Lastly, Mr. McGuire takes issue with the dual registration scheme, arguing that such a duplicative process serves "no other purpose than embarrassment, humiliation, and shaming." (Doc. # 256, at 37.)

53

While Mr. McGuire highlights some very reasonable concerns, the court is unable to say that ASORCNA's provisions do not have a rational connection to the statute's nonpunitive purpose of increasing public safety.  As an initial matter, the Supreme Court noted in *Smith*, that a state is capable of "conclud[ing] that a conviction for a sex offense provides evidence of substantial risk of recidivism."  538 U.S. at 103.[35]  Further, the Court in *Smith* explained that "[t]he Ex Post Facto Clause does not preclude a State from making reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences."  *Id.* (italics omitted).  Accordingly, as was the case in Alaska, Alabama's "determination to legislate with respect to convicted sex offenders as a class, rather than require individual determination of their dangerousness, does not make the statute a punishment under the Ex Post Facto Clause."  *Id.* (italics omitted).

As to the employment and residency restrictions, Mr. McGuire has not carried his burden of proving that they are not rationally related to the aim of public safety.  The argument that it is illogical for a registrant to be able to wander through restricted zones during the day while children are present but not to be able to sleep overnight or engage in employment in those areas, has some traction, but not enough.  First, despite ultimately finding Ohio's sex offender residency restriction in violation of the Ex Post Facto Clause, the court in *Mikaloff* recognized that there was a rational purpose to the residency restriction because limiting

---

[35] It is important to again reiterate the lack of clarity that now permeates the study of recidivism.  Accordingly, the court follows precedent in deferring to state findings regarding recidivism, but does so very skeptically.

where one spends his or her nights logically limits that individual's access to the children of that area. 2007 WL 2572268, at *12 ("The Court concludes that to restrict where an individual sleeps at night, even while it does not restrict where he or she spends her days, has some rational relation to restricting access or opportunity to children in those areas.").[36]  Second, the restrictions limit the potential for an offender to be alone in an area that could conceal criminal conduct.  Living alone and working alone could rationally be considered by the Legislature as providing the potential for periods of unnoticed activity.  Further, the mere possibility that a registrant might be able to exploit loopholes in the regulatory structure does not render the scheme illogical per se.  Thus, the court rejects Mr. McGuire's argument that the employment and residency restrictions are clearly irrational in relation to their stated nonpunitive purpose.

The court finds that, generally, an in-person registration requirement has a rational connection to the stated nonpunitive purpose as well.  As highlighted in *W.B.H.*, registering in-person forces the offender to contact and engage with law-enforcement officers on a regular basis.  *See W.B.H.*, 664 F.3d at 857 ("The in-person requirements help law enforcement track sex offenders and ensure that the information provided is accurate.").  It is rational to believe that requiring this recurring, in-person relationship with law enforcement would foster increased transparency and decrease the likelihood of recidivism.  Additionally, the Legislature made a rational argument in favor of increasing law enforcement's contact with

---

[36] Mr. McGuire attempts to distinguish this finding in *Mikaloff* by arguing that the *Mikaloff* case only involved injunctive relief.  Mr. McGuire's distinction is unavailing; the connection in that case was determined to be rational, separate from any consideration of the threatened consequences for noncompliance.  And this case also only involves potential injunctive relief.

homeless registrants, noting that the shifting nature of those registrants' residences could rationally be expected to increase the risk of concealed and spontaneous reoffending.

Further, the license-notification requirement provided for on the face of the statute is also rationally related to public safety aims.  A notification immediately alerts law-enforcement officials to the registrant's status without delay, again increasing transparency between registrants and law enforcement.  That said, the Legislature did not specify how that provision would be implemented.  In no event did the Legislature require the printing of "CRIMINAL SEX OFFENDER" in bold, red lettering across the face of the license.  But because the Legislature specifically stated the intent of this provision is to notify law enforcement, the provision itself is not excessive.

The travel-permit requirement per se also has a rational connection to the statute's nonpunitive purpose.  First, the travel-permit requirement encourages personal contact with law enforcement, thus satisfying the same rational objective as the in-person registration requirement. *See W.B.H.*, 664 F.3d at 857 (citing *United States v. Powers*, 562 F.3d 1342, 1344 (11th Cir. 2009), for the proposition that registration is rational because it allows law enforcement to track registrants who travel to different jurisdictions).  Second, the travel-permit requirement is rational in that it provides for continuity of contact between jurisdictions, which in turn provides for effective monitoring.  Third, the court rejects Mr. McGuire's argument that, "if a registrant were intending to commit a crime in another county, ASORCNA's travel permit would serve no barrier." (Doc. # 256, at 31.)  Punishing the failure of a registrant to obtain a travel permit utilizes the same method of ensuring compliance as the rest of the statutory regime, and, as was discussed previously, the possibility that a

registrant may take advantage of loopholes does not render the scheme irrational. Finally, there is a rational purpose for the imposition of a three-day requirement to receive a travel permit. As Mr. McGuire acknowledges, the three-day window effectively reduces the possibility of engaging in spontaneous travel.   By preventing spontaneous travel, the Legislature decreases opportunities for concerns such as absconding.

Finally, Mr. McGuire has failed to carry his substantial burden to prove that quarterly double-registration for in-town registrants is irrational.   As has been stated, in-person registration increases contact with law enforcement. Indeed, this was the Legislature's stated purpose for requiring in-person registration.  Ala. Code § 15-20A-2(1) ("Frequent in-person registration maintains constant contact between sex offenders and law enforcement, providing law enforcement with priceless tools to aid them in their investigations including obtaining information for identifying, monitoring, and tracking sex offenders.").[37]   Thus, quarterly duplicative registration per se has a rational connection to the statute's nonpunitive purpose.

Ultimately, Mr. McGuire fails to prove that ASORCNA's provisions do not have rational connections to the scheme's stated nonpunitive purpose.  This "significant" guidepost weighs in favor of finding that ASORCNA generally is nonpunitive.  However, Mr. McGuire was able to draw out important inconsistencies between certain components and ASORCNA's stated nonpunitive intent.   So while this guidepost ultimately highlights

---

[37] Only requiring city police registration in the statute is of course not an option. First, although unlikely, there could hypothetically be a county without municipal police departments. Second, city police generally have no jurisdiction outside the jurisdictional limits of the city and would have no presence in the county to monitor offenders living outside the city.  A unified system, as a practical matter, would have to be under the control of the county sheriff, who has jurisdiction over the entire county, including municipalities.

ASORCNA's nonpunitiveness, those inconsistencies carry some weight, especially as the analysis moves into the fifth and final guidepost.

> **f.      Whether, in Their Necessary Operation, ASORCNA's Provisions are Excessive with Respect to the Provisions' Nonpunitive Purposes**

The final *Martinez-Mendoza* guidepost requires the court to consider whether ASORCNA's provisions, in their necessary operation, are excessive with respect to their nonpunitive purposes.  As a preliminary matter, ASORCNA's individual provisions represent single building blocks stacked to form the statutory scheme under which Alabama's sex offenders are regulated.  Mr. McGuire is not merely subject to isolated provisions; rather, his life is controlled by each of ASORCNA's components operating in unison.  The Legislature passed ASORCNA as a comprehensive scheme, so it is logical to consider the effects of that scheme in sum.  Accordingly, consideration of ASORCNA's effects is not limited to the discrete effects of individual provisions as if they are operating in a vacuum.  Both the Supreme Court in *Smith* and the Eleventh Circuit in *W.B.H.* considered the excessiveness factor in terms of the entire statutory scheme rather than in terms of each individual provision. *See Smith*, 538 U.S. at 104 (analyzing the excessiveness of universal registration and notification of sex offenders without individualized risk assessments); *W.B.H.*, 664 F.3d at 859–60 (evaluating SORNA in a similar manner); *see also id.* at 859 ("The final [*Smith*] guidepost directs us to consider whether the regulatory *scheme* is excessive with respect to its non-punitive purpose.") (emphasis added).  And both *Smith* and *W.B.H.* were dealing with schemes with only a fraction of the features embodied in ASORCNA.  Thus, the cumulative effects of ASORCNA's provisions will be examined.

"The excessiveness inquiry of our ex post facto jurisprudence is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy.  The question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective." *Smith*, 538 U.S. at 105 (italics omitted).  To be sure, the majority of ASORCNA's regulations and restrictions are not novel creations, having been incorporated into various state sex-offender schemes across the country.   And when challenged, these shared provisions have generally withstood excessiveness inquiries.  For example, in-person registration has been held to increase contact between sex offenders and police officers and has been deemed reasonable for that purpose.  *See W.B.H.*, 664 F.3d at 857 (citing *Powers*, 562 F.3d at 1344).  Similarly, registration fees have been upheld, when used to defray the costs associated with maintaining a sex-offender regulatory regime.  *See Mueller*, 740 F.3d at 1135.   Residency restrictions, employment restrictions, and community-notification schemes have all been deemed individually to be reasonable measures for increasing public safety.  *See Smith*, 538 U.S. at 99; *Miller*, 405 F.3d at 723.  Finally, placing the sex-offender designation in red lettering on the front of the license is not *clearly* excessive, though it is subject to serious arguments that it is retributive.  Because the lettering alerts law enforcement and the general public to the registrant's status without delay or potential for error, it passes ex post facto muster.  Individually, none of these measures is clearly excessive in light of states' nonpunitive purposes in regulating sex offenders.

But ASORCNA does not stop there.  Rather, it supplements in-person registration, registration fees, residency and employment restrictions, and community-notification measures with additional provisions creating a scheme that regulates sex offenders far beyond

the scheme in any other state.  For example, excluding legislation aimed at sexually violent predators, no other state has a scheme whereby sex offenders are retroactively regulated for life through residency, employment, and travel restrictions.  In fact, only one other state – Tennessee – employs residency, employment, and out-of-county travel restrictions, and it tempers the effects of these provisions, providing for partial retroactivity and allowing offenders who have successfully complied with the act for ten years to petition for termination of participation in the registration program.  T.C.A. § 40-39-207.  No other state requires dual registration – or dual travel permits – for in-town sex offenders, instead allowing registrants to report to any single local law enforcement agency – whether municipal or county.  *See, e.g.*, Colo. Rev. Stat. § 16-22-102(4.5); 739 Ill. Comp. Stat. 150/1 § 2(d); Kan. Stat. Ann. § 22-4902(m).  Only five other states – Arizona, Delaware, Hawaii, Idaho, and South Carolina – join Alabama in applying sex-offender regulations retroactively for the entirety of a registrant's life, but not one of those five states imposes travel restrictions, and only one of the five imposes residency and employment restrictions.  *See* Ariz. Rev. Stat. Ann. § 13-3821 *et seq*.; Del. Code Ann. § 4120 *et seq*.; Haw. Rev. Stat. § 846E-1 *et seq*.; Idaho Code Ann. § 18-8301 *et seq*.; S.C. Code. Ann. §23-3-400 *et seq*.

ASORCNA is the nation's most comprehensive sex offender regulatory scheme; it is designed to enhance public safety, prevent recidivism, and to protect vulnerable populations. Such a regulatory scheme, by its nature, will have a greater effect in its sum than when each of the scheme's individual components is examined in isolation, but that in and of itself does not make the scheme's cumulative effects unreasonable.  That is not to say, however, that the features that overlay the entire scheme – no risk assessment, lifetime application, retroactive

application for all-time, felony enforcement by the gross, border-to-border (rather than parcel-to-parcel), Ala. Code § 15-20A-11(g), residential and employment restrictions, and the chosen method of printing "SEX OFFENDER" in red lettering on the face of driver's licenses – are entirely nonpunitive and non-retributive.  These provisions are, especially when considered *in toto*, in excess of every other scheme operating across the country, and such a stark comparison highlights areas where ASORCNA's effects have a very real potential to exceed their nonpunitive benefits.[38]  But that is not enough – Mr. McGuire bears the burden of showing by the clearest proof that ASORCNA's provisions are excessive with respect to the Legislature's stated nonpunitive purposes, and Mr. McGuire has failed to carry that heavy burden, with two important exceptions.

First, Mr. McGuire has shown that the provision requiring double, weekly registration for in-town homeless offenders – totaling up to 112 registrations in-person a year – is excessive.  No credible reason was given in support of this requirement.  The argument that such a provision increases contact with law enforcement begs the question and falls into the State's misplaced view of unlimited effects being constitutional:  If *weekly* double registration is good, then *daily* double registration would be sevenfold better?  Considering the additional burdens of felony enforcement for violations, lifetime residential and employment restrictions, and lifetime travel restrictions (with yet more double-registration requirements), the weekly double-registration feature of the scheme for in-town homeless offenders is clearly excessive in relation to ASORCNA's stated nonpunitive purposes.  Requiring a homeless

---

[38] If he is not determined to be "terminally ill or permanently immobile," Ala. Code § 15-20A-23(a), Mr. McGuire will continue to be subject to all these restrictions until he is 90 or 100 years old.

individual to travel to two different law enforcement agencies to complete a substantially identical check-in process every week is so excessive in effect as to be punitive, especially in view of the combined weight of the other features on a homeless offender.  And as established in Section C.II.c, *infra*, this requirement is a direct, affirmative disability or restraint.

Second, Mr. McGuire has shown that the provision requiring the completion of two identical travel permit applications prior to any three-day or more trip outside an in-town registrant's county of residence is excessive.  Again, no credible reason was given in support of this duplicative procedure.  While the State could again point to increased communication with law enforcement, as was discussed above, this is an instance of highly diminished returns coupled with substantially increased burdens.  Additionally, § 15-20A-15(e) already requires the sheriff in the registrant's county of residence (not the municipal jurisdiction) to "immediately notify local law enforcement in the county or the jurisdiction to which the" registrant will be traveling, so it would be logical to conclude that the sheriff could also inform any applicable municipal law enforcement entity of the impending travel once a singular permit is completed.  Ala. Code § 15-20A-15(e).  When considering the double travel permit requirement in light of the other burdens borne by those subject to ASORCNA and the absence of any increase in benefit to ASORCNA's state nonpunitive purpose, the requirement is excessive to the point of being punitive.[39]

As to all other of ASORCNA's provisions, Mr. McGuire has not shown that the Legislature's chosen regulatory means, individually or cumulatively, are clearly excessive in

---

[39] The objection that a municipal jurisdiction should know of such travel is easily resolved by simple communication between the two jurisdictions.

relation to the statute's nonpunitive purposes, and this factor does not point to a finding that ASORCNA as a whole is so punitive in purpose or effect as to negate the Legislature's stated intent. This finding is entered with serious reservations as to some features (especially the red-lettered branding of the face of required identification), but is consistent with the court's understanding of deference due to the judgment of the Alabama Legislature in regulating sex offenders in Alabama, and the State's discretion in implementing the various provisions of the scheme.

### g.      Concluding the *Mendoza-Martinez* Analysis

Based on the analysis of the five most pertinent *Mendoza-Martinez* factors, the court finds that Mr. McGuire has not shown by the clearest proof that ASORCNA's scheme as a whole is so punitive either in purpose or effect as to negate the Legislature's stated nonpunitive intent. Mr. McGuire has met this burden, however, with respect to two of ASORCNA's individual requirements.  Using the *Mendoza-Martinez* factors as guideposts, the court finds that Mr. McGuire has shown that requiring dual, in-person weekly registration for in-town homeless registrants and dual applications for travel permits for all in-town registrants are affirmative disabilities or restraints excessive of their stated nonpunitive intent. In sum, these two requirements are so punitive in their effect as to negate the Alabama Legislature's stated nonpunitive intent by the clearest proof.  Accordingly, those requirements violate the Ex Post Facto Clause of the United States Constitution, and Mr. McGuire is entitled to declaratory relief.

## VI.  RELIEF

Based on the foregoing, it is declared that ASORCNA is unconstitutional under the Ex Post Facto Clause of the United States Constitution to the extent that it requires (1) in-town homeless registrants to register (or check-in) on a weekly basis with two separate law-enforcement jurisdictions as provided by § 15-20A-12(b) in conjunction with § 15-20A-4(13) and (2) all in-town registrants to complete travel permit applications with two separate law-enforcement jurisdictions as provided by § 15-20A-15 in conjunction with § 15-20A-4(13). To clarify, the declaration's scope of relief is limited to invalidation of the dual-nature of ASORCNA's in-town homeless registration and travel permit application requirements. Defendants are capable of determining the appropriate situs for the remaining singular registration and travel permit application procedures.

In light of these constitutional infirmities, attention turns to matters of relief.  These other matters are: (1) whether the unconstitutional requirements of ASORCNA may be severed, allowing the remainder of ASORCNA to remain in force; (2) whether declaratory relief, without an accompanying injunction, is a sufficient remedy; and (3) what is the proper scope of relief in accordance with principles undergirded by the Ex Post Facto Clause?

Severability is a matter of state law, and Alabama directs courts to "strive to uphold acts of the legislature."  *State ex rel. Pryor ex rel. Jeffers v. Martin*, 735 So. 2d 1156, 1158 (Ala. 1999) (citing *City of Birmingham v. Smith*, 507 So. 2d 1312, 1315 (Ala. 1987)).  Because the Alabama Legislature expressed its intention that ASORCNA's provisions be severable

through the inclusion of a severability clause[40] and because ASORCNA can be given effect absent the constitutionally violate requirements, the remainder of ASORCNA remains "intact and in force." *See Jefferson Cnty. Comm'n v. Edwards*, 49 So. 3d 685, 693 (Ala. 2010) (quoting *Smith*, 507 So. 2d at 1315).

As to whether injunctive relief should accompany declaratory relief, there is generally little to no practical difference between the awarding of declaratory relief as opposed to injunctive relief. *Wooley v. Maynard*, 430 U.S. 705, 711–12 (1977). Accordingly, a court generally will "not enjoin the enforcement of a criminal statute even though unconstitutional." *Id.* Here, the court is confident that state officials will abide by the judgment of this court declaring that ASORCNA is unconstitutional under the Ex Post Facto Clause of the United States Constitution to the extent that it requires (1) in-town homeless registrants to register (or check-in) on a weekly basis with two separate law enforcement jurisdictions as provided by § 15-20A-12(b) in conjunction with § 15-20A-4(13) and (2) all in-town registrants to complete travel permit applications with two separate law-enforcement jurisdictions as provided by § 15-20A-15 in conjunction with § 15-20A-4(13).

Finally, the relief provided does not extend to sex offenders convicted after the passage of ASORCNA in 2011. While the State attempts to argue that ASORCNA is a mere reconfiguration or re-enactment of Alabama's prior sex-offender regulatory scheme – the Alabama Community Notification Act ("ACNA") – and that relief should be limited to those

---

[40] The following clause was included in ASORCNA: "The Provisions of [ASORCNA] are severable. If any part of this act is declared invalid or unconstitutional, that declaration shall not affect the part which remains." Ala. Acts No. 2011-640, § 50. Additionally, each statute codified as part of the 1975 Code of Alabama is subject to a severability clause. Ala. Code § 1-1-16.

convicted prior to 1996, such an argument is disingenuous in that ASORCNA's revisions to the ACNA were so extensive and far-reaching as to relegate the prior statute to mere irrelevance.  For numerous reasons scattered throughout this opinion, ASORCNA is far more than a mere reconfiguration of the prior scheme.

## VII.  CONCLUSION

For the foregoing reasons, it is ORDERED and DECLARED that ASORCNA is unconstitutional under the Ex Post Facto Clause of the United States Constitution to the extent that it requires (1) in-town homeless registrants to register (or check-in) on a weekly basis with two separate law-enforcement jurisdictions as provided by § 15-20A-12(b) in conjunction with § 15-20A-4(13) and (2) all in-town registrants to complete travel permit applications with two separate law-enforcement jurisdictions as provided by § 15-20A-15 in conjunction with § 15-20A-4(13).  It is further ORDERED that the Attorney General's oral Motion to Strike and Defendants' oral Motions for Judgment as a Matter of Law are DENIED AS MOOT.

DONE this 5th day of February, 2015.

_____ /s/ W. Keith Watkins _____
CHIEF UNITED STATES DISTRICT JUDGE